No. 24-4048

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

### UNITED STATES OF AMERICA,

Appellant,

v.

### RON K. ELFENBEIN,

Appellee.

*Appeal from the United States District Court for the*
*District of Maryland, Northern Division*
*The Honorable James K. Bredar, Senior U.S. District Judge*

## OPENING BRIEF OF APPELLANT
## UNITED STATES OF AMERICA

**Glenn S. Leon**
**Chief, Fraud Section**

**Jeremy R. Sanders**
**Appellate Counsel**

**U.S. Department of Justice**
**1400 New York Avenue, NW**
**Washington, D.C. 20005**
**(202) 616-2650**


**Erek L. Barron**
**United States Attorney**

**Jason D. Medinger**
**Assistant United States Attorney**

**U.S. Attorney's Office**
**6406 Ivy Lane, Suite 800**
**Greenbelt, Maryland 20770**
**(301) 344-4433**

**August 1, 2024**          *Attorneys for the Appellant*

# TABLE OF CONTENTS

INTRODUCTION AND STATEMENT OF JURISDICTION ...............................1

STATEMENT OF THE ISSUES................................................................5

STATEMENT OF THE FACTS ...............................................................5

SUMMARY OF ARGUMENT ...............................................................18

ARGUMENT ....................................................................................20

I. THE DISTRICT COURT IMPROPERLY GRANTED THE DEFENDANT'S POST-TRIAL RULE 29 MOTION ......................................................20

    A.    Standard of Review.........................................................20

    B.    The district court improperly voided the jury's verdict which was supported by substantial evidence of the defendant's guilt.................21

II. THE DISTRICT COURT IMPROPERLY GRANTED IN THE ALTERNATIVE THE DEFENDANT'S RULE 33 MOTION FOR NEW TRIAL……………..…..40

    A.    Standard of Review.........................................................40

    B.    The district court erred in conditionally granting a new trial because the evidence here overwhelmingly demonstrated the defendant's guilt....41

CONCLUSION ..................................................................................48

STATEMENT WITH RESPECT TO ORAL ARGUMENT .................................50

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## CASES

*Cavazos v. Smith*, 565 U.S. 1 (2011) .........................................................26

*Gannett Co. v. DePasquale*, 443 U.S. 368 (1979).................................47

*Jackson v. Virginia*, 443 U.S. 307 (1979)..........................................21

*Tibbs v. Florida*, 457 U.S. 31 (1982).........................................21

*United States v. Alvarado*, 840 F.3d 184 (4th Cir. 2016) .......................40

*United States v. Archer*, 977 F.3d 181 (2d Cir. 2020) ...........................42

*United States v. Boesen*, 491 F.3d 852 (8th Cir. 2007) ..........................23

*United States v. Colton*, 231 F.3d 890 (4th Cir. 2000) ...........................28

*United States v. Crittenden*, 46 F.4th 292 (5th Cir. 2022).......................43

*United States v. Janati*, 237 Fed. Appx. 843 (4th Cir. 2007) ..................23

*United States v. Jeffers*, 570 F.3d 557 (4th Cir. 2009) ...........................26

*United States v. Harra*, 985 F.3d 196 (3rd Cir. 2012)..........................30

*United States v. Lomax*, 293 F.3d 701 (4th Cir. 2002) ..........................20

*United States v. Martinez*, 763 F.2d 1297 (11th Cir. 1985)....................42

*United States v. McLean*, 715 F.3d 129 (4th Cir. 2013) ................. 21, 28

*United States v. Millender*, 970 F.3d 523 (4th Cir. 2020) .......................20

*United States v. Palin*, 874 F.3d 418 (4th Cir. 2017) ...........................22

*United States v. Perez*, 30 F.4th 369 (4th Cir. 2022)..............................45

*United States v. Perry*, 757 F.3d 166 (4th Cir. 2014) ...........................28

*United States v. Rafiekian*, 68 F.4th 177 (4th Cir. 2023)..........................................21

*United States v. Rafiekian*, 991 F.3d 529 (4th Cir. 2021)........................................40

*United States v. Sarwari*, 669 F.3d 401 (4th Cir. 2012) .........................................30

*United States v. Sharp*, 400 Fed. Appx. 741 (4th Cir. 2010)..................................26

*United States v. Verdeza*, 69 F.4th 780 (11th Cir. 2023).........................................23

## FEDERAL STATUTES AND RULES

18 U.S.C. § 1347 ........................................................................................1, 21, 23

18 U.S.C. § 3231 ........................................................................................................4

18 U.S.C. § 3731 ........................................................................................................4

28 U.S.C. § 1291 ........................................................................................................4

Fed. R. Crim. P. 29.....................................................................................................4

Fed. R. Crim. P. 33...................................................................................................40

# INTRODUCTION AND STATEMENT OF JURISDICTION

Jury verdicts are sacrosanct. They represent the reasoned judgment of our citizens who are tasked with the solemn duty of separating the guilty from the innocent. The Constitution makes them the cornerstone of our criminal process. Jury verdicts should not be lightly cast aside. Yet that is precisely what the district court did here. Because this was error, the lower court's judgment should be reversed.

After participating in thirteen days of trial, hearing from sixteen witnesses, and seeing more than 200 exhibits, the jury in this case convicted Appellee Ron Elfenbein on five counts of health care fraud, in violation of 18 U.S.C. § 1347. JA 5829-5831. Elfenbein was a doctor and the owner of Drs. ERgent Care (the "Clinic"), an urgent care clinic in Maryland. JA 1976.

The charges against Elfenbein arose out of a scheme to defraud Medicare and other insurance companies by over-billing for drive-through COVID-19 testing visits for tens of thousands of patients. JA 22. Specifically, even though the Clinic simply provided seconds-long, routine, drive-through COVID-19 tests for hundreds of patients each day, Elfenbein directed that patients' insurance companies should be billed for lucrative evaluation and management ("E/M") services that were not

1

provided as represented in the insurance claims and the patients' medical records. JA 4450; JA 4462; JA 4464. Instead of billing the appropriate code for each drive-through COVID testing encounter, which would have resulted in him earning less money, Elfenbein instead demanded that his personnel bill each drive-through encounter under code 99204 (which netted him $181.82, JA 5140) or 99214 (which would net $140.30, JA 5143). These latter codes are referred to as "Level 4" office visit codes, and are generally reserved for patient office visits that last more than 45 minutes (for new patients) or 30 minutes (for established patients) or involve a provider performing moderately complex medical decisionmaking. JA 4640; JA 4684.

Elfenbein admitted these drive-through COVID testing visits were neither. JA 4487 (Elfenbein admitting "we want them in and out of the tent in under 5 minutes total" and "[w]e are not there to solve complex medical issues . . . [j]ust to test them"). Indeed, as the jury saw, Elfenbein's employees bragged that they were able to complete an entire visit in seconds. JA 4451 (nurse practitioner explaining that it was "fast and easy" and the "entire patient encounter and chart took 20 seconds").

And if there were any doubt about the propriety of his approach, Elfenbein was told by his medical coder and billing specialist that Level 4's were not appropriate here. JA 861-880. He heard the same thing from a nurse practitioner who worked at the Clinic. JA 1046. He was also the subject of an insurance company audit which concluded the Clinic was improperly billing Level 4 codes. JA 1197-1199. No matter. Elfenbein was focused on profit. When his coder initially suggested billing the tests at a Level 1, Elfenbein retorted, "[t]here has to be a way to bill higher level on these. . . . . We cannot afford to only reimburse at 16$/visit." JA 4436.

As the jury heard and saw, Elfenbein found a way to bill more: he committed fraud. Specifically, he overbilled simple drive-by COVID specimen collection encounters as if they were moderately complex visits or 30- to 45-minute-long in-office visits, regardless of the patient's individual circumstances. JA 4442; JA 4444.

And to paper the files to make them appear to conform to what he was billing, he directed his associates to use template forms that made it appear as if full history and physical exams were conducted. JA 4451; JA 671-672. But it was all a ruse. *Id.* As one witness testified, she simply sat in her car, had her nose swabbed, and

drove away.  JA 694-696.  No physical exams were done on her.  *Id.*; JA 671-672.

And yet, her medical records falsely indicated she had been given a fulsome work-

up.  JA 3648-3649.  The upshot of this scheme:  Elfenbein defrauded Medicare

and other insurers out of millions of dollars in improper reimbursements.  *See* JA

413.

      After hearing all the evidence, the jury deliberated and returned guilty verdicts

on all counts.  JA 2521-2522.

      The district court, however, countermanded the jury.  Specifically, on

December 21, 2023, the district court granted Elfenbein's post-trial motion for

acquittal under Fed. R. Crim. P. 29.  JA 6051.  The court also conditionally granted

Elfenbein's motion for new trial should this Court reverse the Rule 29 ruling.  *Id.*

The district court had jurisdiction over this matter pursuant to 28 U.S.C. § 3231.

      On January 19, 2024, the government filed a timely notice of appeal as to

these rulings.  JA 6054.  This Court has jurisdiction over the government's appeal

pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3731.  Because the district court erred,

this Court should reverse and reinstate the jury verdict.

## STATEMENT OF THE ISSUES

I.    Whether the district court erred in granting Elfenbein's motion for judgment of acquittal by misapplying the relevant standard under Rule 29 and failing to credit all evidence and reasonable inferences therefrom in the light most favorable to the government.

II.   Whether the district court erred as a matter of law by conditionally granting Elfenbein's motion for a new trial in the event this Court vacated its Rule 29 ruling.

## STATEMENT OF THE FACTS

On April 19, 2022, Appellee Ron Elfenbein was indicted on charges of health care fraud.   JA 3.   These charges stemmed from his over-billing Medicare and other insurance entities in relation to COVID-testing encounters that were conducted by his clinic, Drs ERgent Care, an urgent care clinic that operated at several locations in Maryland.   JA 14.   An amended superseding indictment was later returned prior to trial.   JA 14-28.

On July 17, 2023, the matter proceeded to trial.   JA 6.   As detailed below, the government's case established, first, the rules and regulations that governed Elfenbein, and second, how Elfenbein violated these rules by submitting false claims

in connection with his scheme to defraud health care benefit programs, including Medicare and other insurers.

## A.    Background Information On Medicare And CPT Codes

The government's first witness was Stephen Quindoza.   JA 355.   He testified about his 26 years of experience in analyzing Medicare claims data and his knowledge of the rules and regulations governing the submission of claims by physicians for payment from Medicare and other insurers.   JA 358.   He was qualified by the district court as an expert in "Medicare; Medicare processes, rules, and regulations, including enrollment, participation, the processing of claims, coverage, and procedural and diagnostic coding."   JA 361.

Quindoza related that in order to bill Medicare for services rendered by the Clinic, Elfenbein was first required to enroll and certify that he would abide by all of Medicare's rules, and that he would not submit false or fraudulent claims.   JA 374.   Elfenbein first enrolled on behalf of the Clinic in May 2016.   JA 377; JA 2644-2646.   Between 2016 and 2022, Elfenbein re-certified 11 times that he would abide by Medicare's rules, would not submit false claims, and would not submit claims "with deliberate ignorance or reckless disregard for their truth or falsity." *Id.*; JA 382; *see, e.g.*, JA 2695-2696.   To properly submit a claim, Quindoza related

that the claim must be in compliance with the rules and must be supported by accurate medical records.   JA 365-366.

Quindoza then testified about the specific rules related to the use of Current Procedural Terminology ("CPT") codes and how the proper code had to be billed to Medicare.   JA 392.   He testified that visits between a doctor and patient are reported using "evaluation and management service" codes or "E/M" codes.   *Id.* He testified that as of 2021, proper code selection for an E/M claim depended "either on the actual time spent by the practitioner delivering that care, or it can be based on the level of decision making made by that practitioner for the care of the patient." JA 397.   To use CPT Code 99204, which was reserved for new patients, the physician had to do a "medically appropriate history and/or examination" and a "moderate level of decision making."   JA 398; JA 631; JA 4669.   Alternatively, "[w]hen using time for a code selection, 45 to 59 minutes of total time is spent on the date of the encounter."   *Id.*   For CPT Code 99214, which was reserved for existing patients, the physician had to perform "a medically appropriate history and/or examination" and either exercise a "moderate level of decision making" or

"[w]hen using time for a code selection, 30 to 39 minutes of total time spent on the date of the encounter."  *Id.*[1]

Quindoza also testified that CMS published specific guidance for COVID testing encounters.  JA 401; *see also* JA 4684 (American Medical Association ("AMA") guidance dated May 6, 2020).  Specifically, encounters for specimen collection and assessment of COVID tests were to be billed under the 99211 CPT Code.  *Id.*  Quindoza indicated that a Level 4 CPT code was not appropriate for a short, non-complex encounter.  *See* JA 661-664 ("Q:  In 2021, if a service did not

---

[1] The Defendant's expert, Michael Miscoe, agreed with these general parameters, *see* JA 1777-1790 (noting that Level 4's could be justified either by time spent by the provider or by the complexity of medical decisionmaking), although he disagreed with the allegations in the indictment about the application of these terms in the specific charged counts, JA 1860-1876.

It should also be noted that the government's expert did have to clarify his direct testimony at several points during cross-examination.  For example, while he testified on direct to a chart indicating the reimbursement rates for specific CPT codes, Quindoza clarified on cross that he inadvertently chose the wrong year for the 2021 rates and the wrong county for where the Clinic was located, which resulted in the chart containing incorrect rates.  JA 468-486.  Additionally, after being shown guidance from CMS on cross-examination of which he was not previously aware, Quindoza corrected himself that, for telemedicine visits, a comprehensive physical exam and medical history were not required to be documented in 2020.  JA 578-596.  But even Elfenbein's expert agreed that if something *was* documented in a medical record, it had to be true.  JA 1893.

involve moderate complexity decision making and lasted five minutes or less total time, could a provider bill for a 99204 or a 99214? A. No, sir.").

Other witnesses indicated the same thing, and testified that Level 4's were not proper for the kind of testing encounters being billed by the Clinic, including:

(1) Elfenbein's own medical biller/coder, Cathy Raymond, JA 873-874 (testifying about her March 2020 email in which she suggested Level 1 was generally the proper code for COVID test encounters); JA 998 (indicating a Level 4 code for COVID test encounters was not proper based on the documentation she saw for the encounters at the Clinic);

(2) Elfenbein's own nurse practitioners, Deborah Needle, JA 1042 ("I told him that I felt like the codes didn't -- I felt that the level was higher than it should be"); and Stephen Carroll, JA 1634 (agreeing that a specific COVID testing encounter should not have been coded as a Level 4); and

(3) Courtney Sinagra, a certified coder and auditor with CareFirst, JA 1181-1194 (detailing audit findings from 2021 and 2022 where the Clinic was found to have improperly coded Level 4's for simple drive-through COVID test encounters).

**B.** **Elfenbein Executes A Scheme To Defraud Medicare And Other Insurers By Overbilling For Drive-Through COVID Test Encounters**

After establishing the rules that applied to billing for COVID testing, the government demonstrated how Elfenbein broke them. Specifically, the testimony showed how Elfenbein devised, directed, and executed a scheme to defraud by overbilling for drive-through COVID test encounters.

Prior to the pandemic, the Clinic operated as a typical urgent care clinic, and saw approximately 30 patients per day for cold-and-flu care, x-rays, and minor in-office procedures. JA 858.

However, when the pandemic hit in March 2020, the Clinic changed, at Elfenbein's direction. JA 859. The Clinic focused on drive-through COVID testing. *Id.* Patient encounters were quick and routine. *See* JA 668-669. Patients would drive through the parking lot of one of the Clinic's locations, get their nose swabbed, perhaps have their temperature taken and have some limited interaction with a nurse practitioner or physician's assistant (either in-person or virtually through a screen), and then drive away. *Id.*; JA 845-847; JA 1001-1004; JA 1147-1149. Four patients testified at trial (A.H., D.M., S.T., and J.J.), and they reported the interaction with Clinic staff lasted only five to ten minutes. *Id.* Indeed, the encounter for S.T. involved the testing of her and her three children, and

it was still completed in approximately ten minutes.   JA 1003-1004.   The following

photos taken by Elfenbein demonstrate how the operation worked at one of the

locations:





JA 4682-4683.   Specifically, patients waited in a queue in their cars, remained in their cars when their noses were swabbed, temperatures were taken, a provider asked them a couple of questions, and then they drove away.   *E.g.*, JA 1003-1005.   One Clinic employee described the set up this way:   "I feel there is the constant pressure of moving a herd of cattle through a pass at 60 heads per minute!!"   JA 4497.

In March 2020, as they were determining how to bill for services under this new model, Cathy Raymond, Elfenbein's medical biller and coder, suggested billing these drive-through test encounters under CPT Code 99421 (which would yield $16 per encounter) or 99201 (which would yield $47 per encounter).   JA 4436.   This was a non-starter for Elfenbein.   He retorted: "There has to be a way to bill higher level for these . . . . We cannot afford to only reimburse at 16$/visit."   *Id.*   Raymond responded that the problem was that no physical exam was being done, and so that nixed any reliance on a higher E/M code; and she indicated that the time-based model would not yield a higher return either because the visits would not last a sufficient duration.   *Id.*   Elfenbein agreed that "we ARE NOT DOING AN EXAM."   *Id.*   However, instead of relying on his certified medical biller and coder, he flipped it to his business partners for their thoughts.   *Id.*   Raymond later shot back that Elfenbein should remember that just because Medicare was relaxing some

rules because of the pandemic, "[t]hat's not carte blanche for over coding." JA 4438.

And yet, Elfenbein later instructed his personnel to code all COVID testing encounters for at least a Level 4. JA 4441. For symptomatic patients, he indicated a Level 5 (CPT Code 99205/99215) should be used. *Id.* This directive applied across-the-board regardless of what the particular circumstances of a patient encounter were. JA 4444 (Elfenbein directing that "E/M visits for Covid should fall into level 4 or 5"); JA 4461 (Elfenbein stating, "symptomatic Covid testing should be billed as level 5 . . . . [a]symptomatic ones should be billed as 99214/99204"); JA 4464 (Elfenbein stating, "[a] Covid patient is always a level 4 unless they are symptomatic in which case level 5 is justified"). Elfenbein told one of his providers that a COVID patient should "never" be coded as a Level 3. JA 4462.

But these directives were not based on rubrics established by the CPT manual which required an appropriate exam and, for a Level 4, either 30 or 45 minutes of time with the provider (depending if it was an established or new patient) or moderately complex medical decisionmaking. JA 4669. Elfenbein admitted that they were not doing an exam; the patients simply sat in their cars and had their noses

swabbed. JA 4436; *see also* JA 1348 (Clinic employee noting how patients just stayed in their cars). Nor did the Clinic spend close to 30 minutes with each patient; rather, Elfenbein indicated, "we want them in and out of the tent in under 5 minutes total." JA 4487. Nor was there any moderately complex medical decisionmaking involved in the encounters, as Elfenbein admitted. *Id.* (Elfenbein stating, "[w]e are not there to solve complex medical issues . . . [j]ust to test them."). Regardless, Elfenbein instructed that everyone was to be billed at least at a Level 4. JA 1343.

Not everyone in the Clinic agreed with this billing practice. As detailed above, Cathy Raymond told Elfenbein that the visits only qualified for Level 1 or 2 or 3, at best. JA 874; JA 998. She also raised her concerns to others at the Clinic. JA 913. Elfenbein responded by demoting Raymond and forcing her to work the front desk. JA 984-986. Similarly, Deborah Needle, a nurse practitioner at the Clinic, told Elfenbein she did not agree with his coding directives, JA 1042-1044, but he simply instructed her to bill at Level 4, *id.*, and otherwise avoided her when she tried to talk to him about it, JA 1048. The Clinic was also audited by CareFirst in April 2021. JA 4318-4322. The audit found the Clinic had improperly billed for Level 4 visits. *Id.* A subsequent audit in February 2022 revealed that 89 out of 89 files were improperly coded as Level 4's and 5's. JA 1199; JA 4326.

Nevertheless, Elfenbein maintained his directive to bill all asymptomatic patients for at least a Level 4 E/M code. Indeed, to facilitate this directive, Elfenbein introduced template sheets that his personnel had to use. JA 4451. These templates prepopulated a Level 4 code; a provider would have to change it if they wanted to bill lower. JA 1338-1339.

Additionally, the templates prepopulated information that did not match with the reality of the patient encounters. For example, patient A.H. (Count 1 in the indictment) testified about a March 2021 visit she had at the Clinic for COVID testing. JA 669-670. She indicated she stayed in her car, had her nose swabbed, and then drove away "after a few minutes." *Id.* The medical records told a different story. They indicated she was there because of a COVID exposure, JA 3648, which she said was not true, JA 671. The records also indicated the patient was seen by a provider through a virtual web HD camera, JA 3649, but the witness denied any such interaction, JA 672. Additionally, after the encounter, the Clinic called the witness and informed her that her results were negative; the call lasted a minute. JA 674. However, in the medical records, the Clinic claimed "in excess of 32 minutes" was spent on the call and related activities. JA 3647. The jury heard similar testimony from other witnesses about medical records containing

information about their patient encounters that was false or different from their recollections of the encounter. *See* JA 1347 (testimony about patient W.R. (Count 2)); JA 849 (patient D.M. (Count 3)); JA 1157-1160 (patient J.J. (Count 4)); JA 1006-1007 (patient S.T. (Count 5)); JA 1343-1346 (testimony about medical record containing false entries, such as exams documented that were not actually done).

The jury also heard evidence about motive. Specifically, the jury heard testimony about Elfenbein's push to maximize profit. As detailed above, when the pandemic first hit, Elfenbein indicated he could not afford to bill at only $16 per visit; he needed to find a way to bill more. JA 4436. Additionally, in exhorting his employees to bill Level 4's, Elfenbein noted that "E/M coding is our bread and butter" and that "99202 pays way less than 99204." JA 4459; *see also id.* ("If you get 'downcoded' because you did not 'check enough boxes' or simply do enough documentation that could be thousands of dollars in lost revenue per day."). Further, the jury heard evidence that Elfenbein's business lost money in 2017 and 2018, and was only breaking even in 2019. JA 2287. Finally, the jury saw evidence that Elfenbein's personal income soared from $409,000 in 2020 to more than $2 million in 2021. JA 2578.

After the government rested its case in chief, Elfenbein moved mid-trial for a judgment of acquittal under Fed. R. Crim. P. 29.   JA 1549-1564.   The district court denied the motion, stating, "I find that the Government has presented evidence sufficient to sustain each of the five charges."   JA 1563.   The court further expounded, "I ask, could a jury reasonably convict on this evidence.   Is there sufficient evidence from which reasonable jurors could draw inferences that would ultimately support and be sufficient for guilty verdicts on each of the five counts. On the totality of what's been presented here, my conclusion, my answer to that specific question is yes.   Accordingly, the motion's denied."   JA 1564.

After the defense presented its case, which included testimony from the defendant and his coding expert, the jury had its opportunity to render its verdict. The jury quickly returned verdicts of guilty on all charges.   JA 2521-2524.

Notwithstanding the verdict, and the district court's earlier denial of the mid-trial Rule 29 motion, the district court reversed course on December 21, 2023, and granted Elfenbein's post-trial motion.   JA 6051.   In a lengthy opinion, the court concluded that the government failed to present sufficient evidence from which a reasonable jury could conclude beyond a reasonable doubt that the claims were false. JA 5958-6050.   Specifically, the Court held "that the Government did not carry its

burden to prove beyond a reasonable doubt the falsity of the level 4 billing, and finds that the evidence in this case was insufficient to establish, beyond a reasonable doubt, that the level 4 codes used to describe the five encounters that drew charges in the Indictment were false or fraudulent." JA 6006-6007. The court found that relevant guidance on selecting which level visit to bill is ambiguous, and thus the government was required to prove that defendant's interpretation of the coding guidance was unreasonable. *Id.* As detailed more fully below, in making this determination, the court failed to credit the testimony of the government's expert and failed to construe the witness testimony and evidence in the light most favorable to the government. *See generally* JA 5958-6050. Then, in addition to setting aside the jury's verdict, the district court also conditionally granted the defendant's motion for new trial should this Court reverse the Rule 29 decision. JA 6051.

This timely appeal followed. JA 6054. As detailed below, this Court should reverse and reinstate the jury's verdict.

## SUMMARY OF ARGUMENT

The jury heard more than ample evidence that the defendant committed health care fraud. Even though patients at the Clinic were simply getting routine, drive-through COVID testing that lasted just a few minutes, Elfenbein directed his staff to

bill Level 4 codes across-the-board. When his medical biller and coder indicated her disagreement, he demoted her and stripped her of her duties. When one of his nurse practitioners questioned him, he avoided her and made her use template sheets that prepopulated all visits as Level 4's. When he was audited by CareFirst, Elfenbein continued to bill Level 4's regardless, even though the drive-through tests met neither the Level 4 time requirement nor the medical decisionmaking complexity requirement. In short, Elfenbein billed routine COVID testing encounters as complex medical visits. And to paper the files, he used templates that caused medical records to contain false entries as if a full work-up was done when in fact the patients simply sat in their cars, got tested, and drove away.

Because this was more than ample evidence of a scheme to defraud, the district court erred in setting aside the jury's verdicts. In doing so, the district court misapplied the relevant legal standard. The court did not view the evidence in the light most favorable to the government. Nor did the court credit reasonable inferences that could be drawn from the evidence. Rather, the district court substituted its opinion for the jury's. This was error.

Additionally, the district court further erred in granting the Rule 33, for many of the same reasons. Even without the presumption inherent in a Rule 29 ruling,

the evidence here was substantial. Indeed, this Court has affirmed verdicts containing evidence indistinguishable from the case at bar. The district court's ruling here was an abuse of discretion.

For these reasons, the district court's orders should be vacated and the jury's verdict should be reinstated.

## ARGUMENT

The district court erred in granting Elfenbein's post-trial Rule 29 motion. The district court misapplied the Rule 29 standard and did not correctly draw reasonable inferences in favor of the jury verdict, as it was required to do. The court made similar mistakes in conditionally granting a new trial under Rule 33. Because the district court's decision is contrary to the law and the facts, this Court should reverse.

## I. THE DISTRICT COURT IMPROPERLY GRANTED THE DEFENDANT'S POST-TRIAL RULE 29 MOTION.

### A. Standard of Review

The Fourth Circuit reviews *de novo* the grant of a Rule 29 motion for judgment of acquittal after a jury verdict. *United States v. Millender*, 970 F.3d 523, 528 (4th Cir. 2020). When reviewing the sufficiency of the evidence after a conviction, the Court of Appeals must consider the evidence and draw all reasonable inferences

from the evidence in the light most favorable to the government. *Id.*; *United States v. Lomax*, 293 F.3d 701, 705 (4th Cir. 2002). In considering such a challenge, the court asks "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Millender*, 970 F.3d at 528 (quoting *Jackson v. Virginia*, 443 U.S. 307 (1979)) (emphasis in *Jackson*). "[A] judgment of acquittal is appropriate when the evidence is so deficient that acquittal is 'the *only* proper verdict.'" *United States v. Rafiekian*, 68 F.4th 177, 186 (4th Cir. 2023) (quoting *Tibbs v. Florida*, 457 U.S. 31, 42 (1982)) (emphasis added).

### B. The district court improperly voided the jury's verdict which was supported by substantial evidence of the defendant's guilt.

Elfenbein was charged with five counts of health care fraud, in violation of 18 U.S.C. § 1347. JA 14-27. In order to prove health care fraud, the government was required to present evidence that Elfenbein knowingly and willfully executed a scheme to defraud by submitting false claims for payment to health care benefit programs like Medicare and other insurers. *See United States v. McLean*, 715 F.3d 129, 137-38 (4th Cir. 2013).

Numerous cases from this Court demonstrate that the government may satisfy its burden by presenting evidence that the defendant falsified medical records, failed

to provide the services as claimed, and otherwise charged inflated reimbursement rates.   For example, in *United States v. Palin*, 874 F.3d 418, 425 (4th Cir. 2017), a case involving a couple who ran a urinalysis clinic that chose to give patients more expensive and comprehensive tests that were not necessarily required by the referring physicians, the proof demonstrated that the defendants "determined the frequency and type of tests ordered by referring physicians, performed and billed insurers for tests they knew were medically unnecessary, and hid the fact that the tests were unnecessary from insurers so that insurers would not reject their claims." This Court affirmed the convictions, holding that "[t]hat constitutes a scheme to defraud under § 1347."   *Id.*

Similarly, in *McLean*, there was direct evidence that defendant overstated artery blockage percentages in numerous cases, the defendant had a pattern of making misrepresentations in patient files, the defendant made inconsistent explanations for defendant's conduct, the defendant attempted to shred patient files, and there was circumstantial evidence of financial motive.   715 F.3d at 137-38. This was deemed sufficient, even against the defendant's claims that medical standards for determining heart blockage amounts were vague and subject to medical interpretation.   *Id.*

Finally, and as relevant here, this Court affirmed a conviction for health care fraud where the evidence showed the defendant improperly billed office visits at Level 5 (99215) because: (1) he created a template form to eliminate even the option of billing at a level lower than Code 99214; (2) evidence showed that the overwhelming majority of visits were billed at the highest level; and (3) the defendant continued billing at a Level 5 even after being specifically warned following an audit. *United States v. Janati*, 237 Fed. Appx. 843 (4th Cir. 2007). Indeed, as relevant here, the Court in *Janati* helpfully indicated that the focus of the health care fraud statute is on the overall scheme to defraud; the focus should not be on legal compliance with any particular provision of the CPT manual. *Id.* at 846 ("While the Janatis focus on potential ambiguities in various terms of the CPT manual, the fact remains that they were charged with violating the health care fraud statute, 18 U.S.C. § 1347, not the CPT manual.").

Other circuits have affirmed health care fraud convictions on facts very similar to those presented here. *See United States v. Verdeza*, 69 F.4th 780 (11th Cir. 2023) (affirming convictions based on false medical records, cursory or false physical exams); *United States v. Boesen*, 491 F.3d 852 (8th Cir. 2007) (on affirmative government appeal, reversing grant of defendant's motion for judgment

of acquittal because evidence showed that the defendant often consulted with his employees about coding, discussed money issues and how to generate more money, and ensured that medical records "supported" the upcoding even if the entries were not necessarily accurate).

Against these standards, the government submitted more than sufficient proof here. The proof at trial demonstrated that Elfenbein devised a scheme to bill simple, short, routine, drive-through COVID testing encounters as if they were complex medical visits. Elfenbein instructed his staff to bill all encounters for asymptomatic patients at a Level 4, and, for symptomatic patients, at a Level 5, across-the-board. JA 4444; JA 4459; JA 4461; JA 4464. As the government's expert noted, this was contrary to the CPT manual, which required either a substantial time requirement to be met (either 30 or 45 minutes depending on whether the patient was new or established) or the presence of moderately complex medical decisionmaking. The jury saw emails in which Elfenbein admitted the drive-through tests were neither. JA 4436 (Elfenbein admitting that no exams were being done); JA 4487 (Elfenbein stating he wanted the visits to last no more than five minutes and admonishing that they were not there to solve complex medical problems, just to perform COVID tests); JA 4451 (nurse practitioner indicating the entire encounter and charting took

20 seconds). This was also contrary to the advice Elfenbein received from his medical biller and coder, who indicated that Level 4 was not appropriate. JA 873-874. And in an effort to paper over the lack of complexity in the medical decisionmaking, Elfenbein devised and mandated the use of templates which resulted in the inclusion of false information in the medical records. JA 4451. The jury in fact heard evidence that medical records said full work-ups were provided when in fact the patients simply had their noses swabbed and drove away. *E.g.*, JA 669-670. Under *Palin*, *McLean*, and *Janati*, this was more than enough for a rational jury to convict Elfenbein.

The district court erred in concluding otherwise, in several respects.

First, the district court failed to faithfully apply the requisite legal standard. Specifically, rather than drawing all evidence and inferences in favor of the government, the court found ways to ignore the testimony of government witnesses while crediting the testimony of defense witnesses. For example, in its opinion, the district court noted that the government's expert affirmatively testified that CMS issued guidance that assessment and specimen collection for COVID tests should be coded under 99211. JA 6020. (This testimony was corroborated by a May 6, 2020, document issued by the AMA. JA 4684.) Further, the government's expert

indicated that a Level 4 was not proper for visits lasting less than five minutes where complex medical decisionmaking was not performed. JA 661-664. Combined with the witness testimony that this is precisely the kind of patient encounter they had, the jury was absolutely entitled to credit this testimony, and find that Elfenbein's Level-4-across-the-board directive was in fact a scheme to defraud. However, the district court disregarded the testimony of the government's expert based on its view that the testimony was "confusing" or "misleading." JA 6021. The court then credited the testimony of the defense expert to make its point. JA 6021. This was error. The district court was required to take the government's evidence and assume that the jury resolved any conflicting evidence in the government's favor. *United States v. Jeffers*, 570 F.3d 557, 565 (4th Cir. 2009). In ruling on a Rule 29 motion, the district court certainly may not credit one expert witness over another. *See Cavazos v. Smith*, 565 U.S. 1, 7-8 (2011); *United States v. Sharp*, 400 Fed. Appx. 741, 745 (4th Cir. 2010) ("It is the role of the jury to arrive at its own conclusions as to the credibility of the experts and the weight to give their testimony."). In doing so here, the district court erred.

The court similarly disregarded the testimony of other government witnesses whom the jury could have reasonably relied on to determine that Elfenbein's model

was fraudulent. Specifically, the court stated that, "there was no testimony that the jury could credit over [the defense expert's] with respect to the definitions in the CPT Manual and how they are applied to COVID-19 testing encounters." JA That is simply not true. As detailed above, Raymond, who was a certified coder, provided testimony about the relevant codes and how the drive-through visits did not meet the standard. JA 874; JA 998; JA 4436. Similarly, Sinagra testified about CareFirst's audit which found that Level 4's were not the proper code for the simple drive-through test encounters. JA 1181-1199; JA 4318-4322. Moreover, Needle testified she did not believe Level 4's were appropriate, but Elfenbein instructed her to code them that way anyway. JA 1042-1044. Carroll also indicated he later came to believe that the Clinic had wrongly coded the visits as Level 4's. JA 1634. Combined with the testimony of the actual patients whose medical records contained false entries of care that was not rendered, the jury had more than enough to convict Elfenbein. By failing to credit the testimony of Raymond, Needle, Sinagra, and Carroll, the court misapplied the applicable standard and failed to construe all evidence in the light most favorable to the government.

Second, aside from simply misapplying the standard and not construing the evidence in the light most favorable to the government, the district court also erred

by failing to consider holistically the constellation of evidence which demonstrated a scheme to defraud, and instead hyper-focusing on the CPT manual. To be sure, and as detailed below, Elfenbein's scheme was fraudulent under any reasonable interpretation of the CPT manual. But, as this Court cautioned in *Janati*, regardless of any ambiguities in the CPT manual, "the fact remains that [defendants] were charged with violating the health care fraud statute, 18 U.S.C. § 1347, not the CPT manual." 237 Fed. Appx. at 846. In this way, the court erred by not recognizing the evidence that Elfenbein pledged to abide by all of Medicare's rules in submitting claims. JA 377; JA 2644-2646. As the jury heard, Medicare obviously requires that medical records supporting claims must contain true entries of what actually happened. JA 365-366. Here, Elfenbein's templates did the opposite, and testimony at trial established there were false entries in the medical records for the claims associated with the charged counts. Regardless the propriety of the selected CPT code, it is never permissible to submit claims to Medicare based on false medical records. *See McLean*, 715 F.3d at 137-38. Indeed, this Court has recognized that a scheme to defraud may center on "'acts taken to conceal, create a false impression, mislead, or otherwise deceive in order to prevent the other party from acquiring material information.'" *United States v. Perry*, 757 F.3d 166, 176

28

(4th Cir. 2014) (quoting *United States v. Colton*, 231 F.3d 890, 898 (4th Cir. 2000)). In this way, submitting claims based on false medical entries alone would be enough.

But the jury here heard and saw so much more. Beyond the false medical records, the jury heard evidence of a larger scheme perpetrated by Elfenbein, which included: the fact that during the pandemic the Clinic's use of Level 4 codes soared; the fact that Elfenbein created templates that prepopulated Level 4; the fact that Elfenbein directed Level 4's for all COVID testing patients regardless of individualized circumstances; the fact that Elfenbein ignored and then retaliated against his own medical biller and coder; the fact that Elfenbein brushed off and avoided the concerns of his nurse practitioner; the large volume of patients herded through the Clinic's parking lot like it was a fast-food drive-through; the fact that Elfenbein was audited by CareFirst and yet continued to bill at the same level; and the fact that Elfenbein was focused on profit and was exhorting his personnel to bill more and bill higher. Indeed, these factors are precisely the ones this Court indicated were indicative of a scheme to fraud in *Janati*. 237 Fed. Appx. at 847. In this way, the district court erred by failing to look at the scheme holistically and instead hyper-focusing on the CPT manual.

Third, even if we drill down into the CPT manual, the district court's conclusions were wrong because the jury had more than sufficient evidence that Elfenbein's approach was not objectively reasonable and that he knowingly submitted false claims. Here, there was substantial evidence from which a jury could conclude that the defendant's interpretation of the CPT codes was not objectively reasonable. As an initial matter, it should be noted that the reasonableness of Elfenbein's interpretation was a matter for the jury to decide. *United States v. Harra*, 985 F.3d 196, 216 (3rd Cir. 2012) (construing falsity of statements under SEC reporting requirements). And, as the Third Circuit held, "because reasonableness is a question of fact, it does not require the jury to 'constru[e]' highly technical 'written instruments.'" 985 F.3d at 216 n.14 (citation omitted). *See also United States v. Sarwari*, 669 F.3d 401, 407 (4th Cir. 2012) (construing passport fraud conviction and stating "[w]hen a question is not 'fundamentally ambiguous,' but merely susceptible to multiple interpretations, and a defendant's answer is true under one understanding of the question but false under another, the fact finder determines whether the defendant knew his statement was false."). Here, the question of whether the defendant's claimed interpretation of the language was objectively unreasonable was squarely before the jury. The

government presented its interpretation through a combination of the testimony of its expert and its lay witnesses. Defendant presented his view, both through his own testimony and that of his expert. After weighing both, the jury agreed with the government. This should end the matter. If the court is to resolve all differences of the evidence in favor of the government, it had to defer to jury's determination here that Elfenbein's view of the CPT manual was not objectively reasonable. The district court erred by usurping the jury's fact-finding function here.

And while the district court found that the CPT manual was ambiguous, that ruling was error as well. A portion of the CPT manual covering E/M services was admitted at trial, JA 4659, and the government's expert walked the jury through its requirements, JA 397, as did other witnesses. As the expert explained, there were only two ways a provider could justify a Level 4 code: (1) through a time-based model or (2) based on the complexity of the medical decisionmaking. *Id.* Elfenbein eschewed any reliance on a time-based model. As he stated in his emails, he wanted patients in and out in under 5 minutes. JA 4487. Moreover, the evidence indicated that some providers saw as many as 350 patients a day. JA 4469. There is simply no way Elfenbein could have credibly claimed that his providers spent more than 30 minutes with patients. And indeed, the patients who testified

confirmed their interaction with the providers lasted only five to ten minutes. *E.g.,* JA 669-670.

So, this leaves only the medical complexity angle. And here, the district court failed to credit Elfenbein's own words that his providers were not there to solve complex medical problems. But even digging deeper into the manual, the evidence makes clear why the jury rejected Elfenbein's claim that drive-through nasal swab testing encounters sufficed for Level 4 decisionmaking. As the district court noted, the CPT manual provided that moderately complex medical decisionmaking is defined by three elements: "[t]he number and complexity of problem(s) that are addressed during the encounter;" "[t]he amount and/or complexity of the data to be reviewed and analyzed;" and "[t]he risk of complications and/or morbidity or mortality of patient management decisions[.]" JA 5972. Here, as to the first element, most patients did not have a medical "problem" at all. Rather, they were there to receive a test so they could travel or attend sports. *E.g.*, JA 1344. It was not as if they were at the drive-through testing site for treatment of actual COVID symptoms, such as shortness of breath. If anything, the "problem" was the patients' need for a negative COVID test result so they could travel or return to work. Indeed, Elfenbein made clear that if people were asymptomatic (i.e. presenting *no*

medical problems), they should be coded as a Level 4. Simply put, the jury reasonably concluded that the need for a routine COVID test in asymptomatic patients is not the kind of "problem" deserving of a Level 4 code.

At trial and in his post-trial briefing, Elfenbein's defense depended on the jury's acceptance of his post-hoc[2] interpretation of the language "undiagnosed new problem with uncertain prognosis." However, the CPT manual defines "undiagnosed new problem with uncertain prognoses" and provides a helpful example: "A problem in the differential diagnosis that represents a condition likely to result in a high risk of morbidity without treatment. An example may be a lump in the breast." JA 4663. The jury reasonably concluded that an asymptomatic patient seeking a COVID test at a drive-through did not qualify.

The jury also was entitled to credit Elfenbein's own words. Elfenbein made clear that if there was a problem that might present a risk of morbidity or mortality, he did not want his clinicians to try to solve it; rather, they were to send anyone needing that level of care to the emergency room. JA 4487. And the decision to

_____

[2] Elfenbein admitted he came up with his billing guidance without ever looking at the CPT Code Manual. JA 2260 ("Q. So you came up with the 4s and 5s without ever consulting a CPT code manual; is that what you're saying? A. At that particular time, correct."). Accordingly, his exegesis of the CPT manual's terms necessarily came *after* he devised and started to implement the charged scheme.

33

refer a patient to the ER would not qualify for Level 4 either. Indeed, as the CPT manual made clear, "[a] problem is addressed or managed when it is evaluated or treated at the encounter by the physician or other qualified health care professional reporting the service. . . . Referral without evaluation (by history, examination, or diagnostic study[ies]) or consideration of treatment does not qualify as being addressed or managed by the physician or other qualified health care professional reporting the service." JA 4662-4663. In this way, Elfenbein was directing his staff *not* to address any problems; he was asking them to do the specimen collection and then move along; and if there were any real problems to solve, Elfenbein wanted patients referred elsewhere. As Elfenbein routinely intoned, the drive-through testing sites were just there to test. Nothing more.

Moreover, even the templated medical records demonstrated that Elfenbein knew these patients were not presenting with complex medical problems. Defendant's expert explained that "a self-limited or minor problem," corresponding to a Level 2 visit, is "something that's going to resolve with usually over-the-counter [drugs] or instructions like rest, gargling, sore throat, something like that." JA 1870; JA 1901-1902. As the defendant's expert conceded, the Clinic's medical records provided for precisely that treatment plan: "Rest and keep hydrated.

34

Tylenol as needed." JA 3671 (Govt. Ex. 404); JA 3685 (Gov. Ex. 405); JA 3755 (Gov. Ex. 407).

As to the second element, the jury heard evidence that "the amount and complexity" of the data was not great; the Clinic personnel simply performed a quick rapid test, and then sent the sample away for PCR testing. There was little to nothing to analyze. That is why the government's expert, and Cathy Raymond, and the CMS guidance indicated that 99211 (specimen collection) was the most appropriate code because that is ultimately what the Clinic was doing: collecting specimens and sending them out to the lab for further review.

As to the third element, the jury was entitled to conclude there was no risk of morbidity or mortality in asymptomatic patients. As was made clear to the jury during cross-examination of the defendant's expert, the medical records showed that the treatment, if any, was to rest, keep hydrated, and take over-the-counter medication. The jury easily concluded that, consistent with the defendant's expert's testimony, that treatment is not the treatment for a problem involving a high risk of morbidity or mortality—instead, it is consistent with a minor or self-limited problem which is at best a Level 2, not a Level 4.

In these ways, the district court fundamentally erred in failing to marry up the evidence presented with the definitions in the CPT manual. But the jury did, and rejected Elfenbein's approach. Under *Harra*, that was the jury's call to make. The district court erred in overriding it.

If this were not enough, the jury also heard evidence of CMS' guidance which confirmed the unreasonableness of Elfenbein's interpretation of the CPT manual. Specifically, the jury heard evidence that in May 2020, CMS issued guidance that stated: "CMS has finalized new specimen collection fees for COVID-19 testing under the PFS [Physician Fee Schedule]. Physicians and NPPs [Non-Physician Practitioners] must use CPT code 99211 to bill for a COVID-19 symptom and exposure assessment and specimen collection provided by clinical staff (such as pharmacists) incident to the physician's or NPP's services. This applies to all patients, not just established patients. The direct supervision requirement may be met through virtual presence of the supervising physician or practitioner using interactive audio and video technology." JA 5160. Additionally, the jury heard that CMS published an Interim Final Rule in the Code of Federal Regulations in May 2020 which provided that, "[r]ecognizing the critical importance of expanding COVID-19 testing, in this IFC [interim final rule with comment period], we are

providing additional payment for assessment and COVID-19 specimen collection by HOPDs [Hospital Outpatient Departments], and physicians and other practitioners, to recognize the significant resources involved in safely collecting specimens from many beneficiaries during the pandemic," that "[f]or the duration of the COVID-19 PHE [public health emergency], we are therefore finalizing on an interim basis that when the services described by CPT code 99211 for a level 1 E/M visit are furnished for the purpose of a COVID-19 assessment and specimen collection, the code can be billed for both new and established patients." JA 5503. Further, the interim rules stated, "We believe this policy will support expanded access to COVID-19 testing, and provide appropriate payment for COVID-19 testing-related services furnished by physician[s] and other practitioners." *Id.* The jury was entitled to conclude that this guidance directly related to the kind of services that the Clinic was providing, and hence Elfenbein's interpretation of the CPT manual was wholly unreasonable.

But this was not all. The government also introduced evidence from Elfenbein's contracted medical billing company representative that the Clinic billed Level 4's at rates many times the national average. Specifically, David Turner, a representative of BlueFish Medical, testified about analyses his company had done

for the Clinic which showed the high usage of Level 4's and how the Clinic was well above the national average for such claims. JA 741. Additionally, the jury saw evidence of BlueFish's reports which confirmed as much. JA 4523; JA 4541; JA 4560. One such report from April 2021 is reproduced here showing that 95.9% of the time, the Clinic billed 99204 for new patient E/M visits, which was three times the national average of only 33.6%:



JA 4541 (referring to the Clinic as "Gambrills").[3] These reports were shared with Elfenbein on a monthly basis. Indeed, one BlueFish representative specifically

---

[3] Turner clarified on cross-examination that he was not sure the source of the data set from which the national average was derived, and that it could have included pre-

highlighted in an email to Elfenbein that "the number of 99204's and 99214's is high and well above the national average."  JA 4511.  Given that Elfenbein's approach was leaps and bounds apart from his peers, the jury was entitled to use this data to conclude that Elfenbein's interpretation of the CPT manual was unreasonable.

In sum, the jury was presented with a wealth of information that Elfenbein devised and executed a scheme to defraud.  From the government's expert, to Elfenbein's own employees, to Elfenbein's own emails, to the fake medical records, to the CPT manual provisions, to the CMS guidance, to the Carefirst audit, to the BlueFish reports, to Elfenbein's financial data, there was an avalanche of evidence supporting the government's theory that Elfenbein submitted false claims for Level 4 visits for what were simple drive-through COVID test encounters.  This is why the district court correctly denied Elfenbein's mid-trial Rule 29 motion.  It erred in reversing course after trial.  Pointedly, the district court was wrong to countermand the jury's verdict.  This Court should reverse.

---

pandemic data.    JA 833-835.    In other words, the national average in the chart did not necessarily correspond to the Clinic's peers in the same given month of the report.    However, the government admitted the exhibit to show Elfenbein's knowledge that he was told he was above the national average by a large margin in terms of his billing practices.

## II. THE DISTRICT COURT IMPROPERLY GRANTED IN THE ALTERNATIVE THE DEFENDANT'S RULE 33 MOTION.

### A. Standard of Review

The Fourth Circuit reviews the grant of a new trial for abuse of discretion. *United States v. Rafiekian*, 991 F.3d 529, 549 (4th Cir. 2021). "Although that standard 'accords deference to the district courts, it does not insulate them from review,' and a court errs when it '(1) acts arbitrarily, as if neither by rule nor discretion, (2) fails to adequately take into account judicially recognized factors constraining its exercise of discretion, or (3) rests its decision on erroneous factual or legal premises.'" *Id.* (quoting *United States v. Alvarado*, 840 F.3d 184, 189 (4th Cir. 2016)). Although a court's authority under Rule 33 "'is much broader than when it is deciding a motion to acquit,' because it is no longer 'constrained by the requirement that it view the evidence in the light most favorable to the government[,]' [n]evertheless, the 'standard for jettisoning a jury verdict in favor of a new trial' remains 'demanding,' and courts must exercise their discretion to do so 'sparingly.'" *Id.* (quoting *Millender*, 970 F.3d at 531-32).

**B.** **The district court erred in conditionally granting a new trial because the evidence here overwhelmingly demonstrated the defendant's guilt.**

The district court also erred in conditionally granting Elfenbein's motion for a new trial. This is because the evidence, as detailed exhaustively above, demonstrated clearly that Elfenbein devised and executed a scheme to defraud. As detailed below, the district court was wrong to wholly discount the evidence that the jury found so persuasive.

Federal Rule of Criminal Procedure 33(a) provides that, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." In making a determination on such a motion, a district court may not simply "harken back" to its analysis granting a Rule 29 motion. *United States v. Rafiekian*, 991 F.3d 529, 551 (4th Cir. 2021). Rather the court must go much farther in weighing the evidence and demonstrating why a jury's verdict should not be reinstated.

Furthermore, when, as here, the weight of the evidence is the ground for the grant of a new trial, the bar is set very high. A new trial can only be granted on these grounds where the evidence weighs "heavily against the verdict [such] that a serious miscarriage of justice may have occurred." *United States v. Rafiekian*, 68

F.4th 177, 188 (4th Cir. 2023); *accord United States v. Archer*, 977 F.3d 181, 188 (2d Cir. 2020); *United States v. Martinez*, 763 F.2d 1297, 1312-13 (11th Cir. 1985) ("The court may not reweigh the evidence and set aside the verdict simply because it feels some other result would be more reasonable . . . . The evidence must preponderate heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand.").

The district court's analysis here comes nowhere close to meeting the standard set forth in *Rafiekian*. Indeed, as an initial matter, it does not appear that the district court even applied the proper standard. Nowhere in its opinion does it conclude that allowing the verdict to stand would constitute a "miscarriage of justice." JA 6048 (simply finding it would be "unjust"). The failure to apply the proper standard would be legal error and by itself sufficient for this Court to find an abuse of discretion.

But even looking at the record, the district court clearly erred as a factual matter because the evidence was not so paltry that it would be a miscarriage of justice to allow the conviction to stand. Indeed, the evidence here was abundant. It included direct evidence of Elfenbein's plan in which he mandated his personnel to bill Level 4's across the board. There was testimony from numerous witnesses who

indicated they told Elfenbein they did not agree with his billing practices. There were medical records which contained false entries. There were photos of the simple drive-through testing model that Elfenbein established. There was circumstantial evidence of Elfenbein's knowledge of falsity, including his non-reaction to the audits, his retaliation and marginalization of those who questioned him, and his mandated templates that forced providers to toe the line. There was a reason the jury returned a swift and unanimous verdict: it was because the evidence of guilt was overwhelming. Because the district court's opinion fails to demonstrate a miscarriage of justice, this Court should reverse. *United States v. Crittenden*, 46 F.4th 292, 298 (5th Cir. 2022) ("This is not one of the 'exceptional cases' in which a judge had discretion to vacate the jury's verdict by ordering a new trial. Far from being a case in which the evidence weighs heavily against the verdict, the great weight of the evidence supports this one.").

Moreover, a review of the district court's opinion, JA 6044-6049, reveals that it made the same mistakes as it did when ruling on the Rule 29 motion.

First, while the district court completely discounts any testimony by the government's expert based on its view on how the expert was impeached on various points, JA 6045, this is error. As detailed above, the government's expert testimony

was consistent that Level 4 was not the proper code for simple COVID specimen collection encounters. This was corroborated by both the CMS guidance issued in May 2020, as well as publications in the Federal Register. The district court arrived at incorrect factual conclusions because it failed to account for all the evidence that supported the expert's testimony on the key questions at issue here. And while the district court placed great emphasis on the fact that the expert was impeached by the defense on certain points and failed to have command of all the interim rules that had been published during COVID as to each part of the CPT manual, the district court lost the forest through the trees. Not only did the government's expert correctly relay to the jury the language of the CPT manual, and the requirements of the CPT codes relevant to the five charged counts, the government's expert referred to the CMS guidance regarding the use of 99211 as the code for a COVID testing encounter. That the government's expert was impeached and subsequently corrected himself on cross-examination regarding the documentation requirements for telemedicine E/M codes does not warrant the district court's complete disregard of all of his testimony. Moreover, the government's expert indicated that medical records could not be falsified, and the defense expert properly agreed with that basic maxim. By wholly discounting everything the expert said, simply because of

impeachment in some areas, the district court committed both legal and factual error. *See United States v. Perez*, 30 F.4th 369, 377 (4th Cir. 2022) (impeachment of a witness in one area is not necessarily grounds to wholly disregard the testimony).

Second, the district court abused its discretion in giving such significant weight to the testimony of the defendant's coding expert (Miscoe) when the expert's opinion was based entirely on his review of medical records, which were shown to be false or misleading.  For example, Miscoe testified at length on direct examination that a particular encounter involving a patient met the criteria for Level 4 billing.  JA 1749-73.  But on cross-examination, Miscoe admitted his opinion about applicable codes for specific patient encounters was only reliable to the extent the medical records were reliable.  JA 1888 ("Q:  And if the record is false, then your scoring can't be what happened at the encounter, right?  A. If that's true, yes.").  Given that the records were proven to contain inaccuracies, the district court abused its discretion in relying on expert testimony which lacked a proper factual foundation.

Third, the district court's dismissiveness of the testimony of Raymond and Needle was equally erroneous.  The district court first discounted their testimony because they left before 2021.  But, that is a distinction without a difference.

Elfenbein devised this scheme to defraud in March 2020 while Raymond and Needle were present, and he continued to execute his plan in the same manner after they left. Their testimony should not have been discarded whole-cloth on this ground. Additionally, while the district court indicated that their testimony was not tied to the CPT manual, this is not true. Raymond discussed the manual at length and demonstrated why the codes billed were not correct. And moreover, as the government indicated above, the court's hyper-focus on the CPT manual was error. The court was required to consider the scheme to defraud holistically. Because the basis for excluding the testimony of Raymond and Needle relied on the same faulty legal premise as adopted above, this provides additional ground for reversal.

Fourth, the district court improperly glossed over substantial evidence of guilt as simple "atmospheric[s]." JA 6048 (referring to the Defendant's emails, among other things). But this fundamentally ignores the import of these pieces of evidence. Indeed, Elfenbein's email that he wanted patients in and out in five minutes and that the providers were not there to treat complex problems could have been sufficient alone. Far from mere atmospherics, that shows Elfenbein eschewing any reliance on the time parameter for a Level 4 visit, as well as an admission that the Clinic is not engaging in the kind of complex medical

decisionmaking required to satisfy the complexity parameter for a Level 4 code. Moreover, the court was wrong to ignore the excessive volume of patients being herded through the Clinic, and how that undercut any notion that moderately complex medical decisionmaking was taking place. Indeed, Elfenebein's own expert in treating patients exposed to COVID, Hugh Hill, testified he doubted any one provider could have sufficient time to even see 150 patients in a day. JA 1697-98. The district court abused its discretion in lumping together and then casting aside such key pieces of evidence.

In sum, because the district court improperly discounted or overlooked substantial evidence of guilt, it abused its discretion in ordering a new trial. The court's opinion does not come close to meeting the high bar to establish that a conviction would be a "miscarriage of justice." Rather, the verdicts were supported by substantial evidence. This Court should reverse.

* * *

Our Constitution places juries at the cornerstone of our criminal justice system. And while the jury trial guarantee is a benefit afforded to the accused, the Supreme Court has also recognized that "the public has an interest in having a criminal case heard by a jury." *Gannett Co. v. DePasquale*, 443 U.S. 368, 383

(1979).   Here, the jurors are the representatives of the public.   They represent the

society whose laws have been broken by the accused.   It is for this reason that so

much deference must be afforded to jury verdicts.   It is also why the district court's

orders here must be vacated and reversed.   The district court cast aside the reasoned,

unanimous judgment of the jury, usurped its role, and substituted its judgment for

the jury's.   The court then took the additional extraordinary step of conditionally

granting a new trial should this Court reverse.   For the reasons stated above, this

Court should reverse, and the jury's verdicts should be reinstated.

## CONCLUSION

Based on the foregoing, the government respectfully requests that this Court

reverse the district court's grant of Elfenbein's motion for acquittal and new trial,

and reinstate the jury's verdict.

Respectfully submitted,


Glenn S. Leon
Chief, Fraud Section

By: _____/s/_____
Jeremy Raymond Sanders
Appellate Attorney

U.S. Department of Justice
1400 New York Avenue, NW

Washington, D.C. 20005

Erek L. Barron
United States Attorney

By: _____/s/_____
Jason D. Medinger
Assistant United States Attorney

United States Attorney's Office
6406 Ivy Lane, Suite 800
Greenbelt, MD   20770

## STATEMENT WITH RESPECT TO ORAL ARGUMENT

The United States respectfully request oral argument in this case given the voluminous record and the legal issues presented.

# CERTIFICATE OF COMPLIANCE

1.      This brief has been prepared using:

   **Microsoft Word, Times New Roman, 14 Point**

2.      EXCLUSIVE of the corporate disclosure statement; table of contents; table of citations; statement with respect to oral argument; any addendum containing statutes, rules, or regulations, and the certificate of service, the brief contains 10,223 words.

I understand that a material misrepresentation can result in the Court's striking the brief and imposing sanctions. If the Court so directs, I will provide an electronic version of the brief and/or a copy of the word or line print-out.

_____/s/_____
Jason D. Medinger
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 1st day of August 2024, I electronically

filed the foregoing with the Clerk of Court using the CM/ECF System, which will

send notice of such filing to the following registered CM/ECF users:

Gregg Lewis Bernstein, Esq.
Martin S. Himeles, Jr., Esq.
Samantha Miller, Esq.
Zuckerman Spaeder LLP
100 East Pratt Street, Suite 2440
Baltimore, Maryland 21202


_____/s/_____
Jason D. Medinger
Assistant United States Attorney