# IN THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Appellant*

–v–

RON ELFENBEIN,

*Appellee.*

On Appeal from the United States District Court
for the District of Maryland, Northern Division
The Honorable James K. Bredar, 1:22–cr–00146–JKB

## BRIEF OF APPELLEE RON ELFENBEIN

October 1, 2024

Gregg L. Bernstein
Martin S. Himeles, Jr.
Samantha A. M. Kavanagh
ZUCKERMAN SPAEDER LLP
100 East Pratt Street, Suite 2440
Baltimore, Maryland 21202

*Attorneys for Appellee Ron
Elfenbein*

## Statement of Disclosure

In conformance with Rule 26.1 of the Federal Rules of Appellate Procedure and Local Rule 26.1, Defendant-Appellee Ron Elfenbein states no publicly held corporation or any other entity or individual has a financial interest in the outcome of this litigation.

# TABLE OF CONTENTS

Statement of Disclosure ...................................................................................ii

TABLE OF CONTENTS ................................................................................i

TABLE OF AUTHORITIES ..........................................................................iii

INTRODUCTION ........................................................................................ 1

STATEMENT OF THE ISSUES.................................................................... 3

STATEMENT OF THE FACTS .................................................................... 3

E/M Coding Rules During the Pandemic...................................................... 7

Code Selection at DEC................................................................................ 10

DEC Employees' Testimony About Coding ................................................ 13

The CareFirst Audits .................................................................................15

The Alleged "Executions" of the Scheme...................................................15

Testimony of Coding Experts .................................................................... 19

The Verdict and Judgment of Acquittal ....................................................20

ARGUMENT............................................................................................... 21

I.    The district court properly granted a Judgment of Acquittal. ........... 21

    A.    Standard of Review.................................................................. 21

    B.    The government failed to prove the falsity of the level 4
          coding. ................................................................................... 22

       i.      The rules and guidance for CPT code selection are ambiguous, and the government offered no evidence to resolve the ambiguity. ................................................. 23

       ii.     No expert testimony established that level 4 was incorrect as applied to the services at issue. .................. 26

       iii.    No other testimony established that level 4 was wrong. ........................................................................ 30

       iv.    The "constellation" of other evidence of "a scheme to defraud" did not supply the missing proof that level 4 was the wrong code. ........................................... 32

   C.   The government's substitution of "common sense" for evidence that level 4 was incorrect contravened the controlling rules. .............................................. 35

   D.   The government did not charge—or prove—a scheme to defraud based on "fake" medical records. ........................... 44

   E.   The government's cited cases do not support reversal of the district court's grant of judgment of acquittal. ............... 47

II.   The district court did not abuse its discretion in conditionally granting Dr. Elfenbein's motion for a new trial. .......... 52

   A.   The district court's ruling conditionally granting Dr. Elfenbein's motion for new trial is reviewed for abuse of discretion. ................................................ 53

   B.   The district court soundly exercised its discretion in finding that it would be unjust to enter judgment. ................... 53

CONCLUSION ........................................................................... 60

STATEMENT WITH RESPECT TO ORAL ARGUMENT ........................... 61

CERTIFICATE OF COMPLIANCE ............................................... 62

CERTIFICATE OF SERVICE ........................................................ 63

# TABLE OF AUTHORITIES

## Cases

*Counts v. Pollock,*
   No. 3:18-cv-1072-J-39JBT, 2020 WL 5534444
   (M.D. Fla. Aug. 21, 2020) ........................................................... 26

*Jackson v. Virginia,*
   443 U.S. 307 (1979) ..................................................................... 21

*Siddiqi v. United States,*
   98 F.3d 1427 (2d Cir. 1996) ......................................................... 45

*Tibbs v. Florida,*
   457 U.S. 31 (1982) ................................................................. 23, 52

*United States v. Arrington,*
   757 F.2d 1484 (4th Cir. 1985) ...................................................... 53

*United States v. Boesen,*
   491 F.3d 852 (8th Cir. 2007) ................................................... 50, 51

*United States v. Burroughs,*
   564 F.2d 1111 (4th Cir. 1977), *abrogated on other grounds, United States
   v. Steed,* 674 F.2d 284 (4th Cir. 1982)........................................ 22

*United States v. Diaz,*
   No. 07-20398-CR, 2008 WL 906725 (S.D. Fla. Mar. 28, 2008) ............ 26

*United States v. Harra,*
   985 F.3d 196 (3d Cir. 2021)........................................... 41, 42, 43

*United States v. Janati,*
   237 F. App'x 843 (4th Cir.), *cert. denied,* 552 U.S. 1055 (2007) .. 36, 48, 49

*United States v. McLean,*
   715 F.3d 129 (4th Cir. 2013) ....................................................... 48

*United States v. Millender,*
  970 F.3d 523 (4th Cir. 2020) ................................................. 22

*United States v. Palin,*
  874 F.3d 418 (4th Cir. 2017) ................................................. 48

*United States v. Powell,*
  469 U.S. 57, 67 (1984) ....................................................... 52

*United States v. Rafiekian,*
  68 F.4th 177 (4th Cir. 2023) ......................... 22, 23, 52, 53, 54, 55, 57, 59

*United States v. Sarwari,*
  669 F.3d 401 (4th Cir. 2012) ............................................... 43

*United States v. Selbe,*
  27 F.3d 564 (4th Cir. 1994) (unpublished) ................................. 22

*United States v. Siddiqi,*
  959 F.2d 1167 (2d Cir. 1992) ............................................... 23

*United States v. Verdeza,*
  69 F.4th 780 (11th Cir. 2023) .............................................. 50

**Rules**

Fed. R. Crim. P. 29 ........................................................... 20, 21
Fed. R. Crim. P. 33 ....................................................... 20, 53, 57

**Other Authorities**

*Weight of the Evidence,* BLACK'S LAW DICTIONARY (11th ed. 2019)............. 58

**INTRODUCTION**

The government charged Dr. Ron Elfenbein with a scheme to defraud based on its contention that he broke the complex set of rules that govern healthcare reimbursement. This was, in short, an "upcoding" case—one premised on the government's allegation that Dr. Elfenbein's urgent care company used specific codes to claim reimbursement from insurers that the government claimed did not accurately represent the medical services rendered.

At trial, the government neither established the appropriate coding rules for the medical services provided by the urgent care center, nor proved that Dr. Elfenbein broke them. Instead, the government formulated its own, "commonsense" view of healthcare reimbursement guidelines and ignored binding rules that contradicted that view. The government's only expert witness—who displayed a stunning lack of knowledge of the pandemic-era coding regime—offered no opinions about the actual claims at issue. At the close of its case, the government urged the jury to convict Dr. Elfenbein of five counts of health care fraud without regard to the rules for selection of reimbursement codes because, "[c]ommon sense says that the defendant's justification cannot be true." JA2422. The jury convicted.

Then-Chief Judge James K. Bredar's painstaking review of the evidence, as detailed in his 90-page opinion, led him to the correct

conclusion that insufficient evidence supported Dr. Elfenbein's guilt beyond a reasonable doubt. Notwithstanding the government's attempt to conflate two separate elements—falsity and intent—the district court recognized that without evidence that the claims were false, Dr. Elfenbein's conviction could not stand. As the court found, the government's case was smoke without fire, a crime premised on the submission of "false" representations to insurers that were not proved false.

On appeal, the government resorts to the same tactics it employed before the jury: oversimplification of the rules and overstatement of the evidence. The government also seeks to recast its case as one about "fake" medical records—an argument unsupported by the facts and untethered from the case it charged and tried. But the government's unflattering portrait of Dr. Elfenbein does not establish that he committed a crime. And, by now, the government's refusal to contend with the very rules it charged Dr. Elfenbein with breaking evinces a troubling view that conduct is criminal because federal prosecutors say so.

The district court correctly entered judgment of acquittal. Because allowing the verdict to stand would be unjust, the district court also soundly exercised its discretion in conditionally ordering a new trial. This Court should affirm.

## STATEMENT OF THE ISSUES

1. Whether the district court properly granted Dr. Elfenbein's motion for judgment of acquittal where the government failed to prove an essential element of the alleged offense.

2. Whether the district court, after presiding over the nearly three-week trial, acted within the bounds of its broad discretion in finding that the evidence weighed so heavily against the verdict that it conditionally granted a new trial.

## STATEMENT OF THE FACTS

Dr. Elfenbein is an emergency room physician who, in 2016, opened Drs ERgent Care ("DEC"), an urgent care center in Gambrills, Maryland. JA5384.[1] In 2020 and 2021, at the height of the pandemic, DEC treated large volumes of patients seeking COVID-19 testing and related services. JA0859-JA0860. DEC provided those services and submitted thousands of claims for reimbursement to Medicare and other insurers. JA0859-0860.

Such claims are required to include Current Procedural Terminology ("CPT") codes assigned to patient encounters, which determine the amount reimbursed. The requirements for each code are based on complex rules

---

[1] At trial, some witnesses referred to the company as Drs ERgent Care and others referred to it as First Call, the name it adopted following a merger. *See* JA1983-1986, JA858, JA1063. We refer to it as DEC.

established in a lengthy annual publication (the "CPT Manual") of the American Medical Association ("AMA"). The rules in the CPT Manual are modified and supplemented by government regulations and guidance and by AMA publications. JA0391, JA1724-1726.

Here, the relevant codes are for office and other visits, referred to as "evaluation and management" ("E/M") services. The pertinent section of the CPT Manual includes five "levels" of E/M visits, with higher levels requiring more complex "medical decision making" ("MDM"), determined according to criteria specified by the Manual. The E/M CPT codes range from 99201 to 99205 (for new patients) and 99211 to 99215 (for existing patients), with the last digit reflecting the level. JA4987-4989, JA5015-5017. Level 4 codes (99204 and 99214) are for patient encounters in which a provider uses a "moderate" level of MDM. The government alleged that Dr. Elfenbein instructed providers at DEC to inflate reimbursements by selecting level 4 CPT codes when there was not moderate MDM.[2]

---

[2] Under rules that changed during the pandemic, the level of E/M services can alternatively be supported by the duration of the services if the provider chooses. It was undisputed that DEC always selected codes based on MDM, JA2233, and the government's repeated reference to the duration of visits as relevant to the appropriate code both below and here is disingenuous. The changing requirements for selecting the level are discussed further below. *See infra* pp. 7-10.

The government charged Dr. Elfenbein in a Superseding Indictment with a two-pronged heath care fraud scheme: (1) requiring that patients presenting for COVID-19 tests receive "medically unnecessary" visits with providers; and (2) instructing DEC providers—licensed Nurse Practitioners and Physicians' Assistants—to bill for those visits using reimbursement codes that did not accurately describe the encounters. JA0023-0024.[3] The Superseding Indictment quoted the code definitions for level 4 codes in 2020 and 2021, JA0021-0022, and alleged that Dr. Elfenbein directed DEC providers to "bundle" COVID-19 tests with provider visits (*i.e.*, E/M services) and to bill those visits as "moderate complexity"—level 4—"even though such encounters did not occur as represented." JA0024. All five counts of health care fraud corresponded to specific office visits assigned level 4 CPT codes:

| Count | Medicare Beneficiary | Date of Submission of Claim | Date of Service | Claim No. | Payor | Procedure Code; Amount Billed |
|-------|----------------------|-----------------------------|-----------------|-----------|-------|-------------------------------|
| 1 | A.H. | 03/29/2021 | 03/25/2021 | 691021088249240 | Medicare | CPT 99204 $354.22 |
| 2 | W.R. | 05/03/2021 | 04/23/2021 | 691021123406780 | Medicare | CPT 99204 $354.22 |
| 3 | D.M. | 05/12/2021 | 05/10/2021 | 691021132127230 | Medicare | CPT 99204 $354.22 |
| 4 | J.J. | 03/5/2021 | 03/2/2021 | 372663924 | CareFirst BCBS | CPT 99214 $231.50 |
| 5 | S.T. | 04/28/2021 | 04/19/2021 | 327993824 | CareFirst BCBS | CPT 99204 $354.22 |

---

[3] Due to a non-substantive error, the government later filed an Amended Superseding Indictment. JA0014. For simplicity, we refer to the operative indictment simply as the Superseding Indictment.

JA0025.

At trial, the government presented no evidence of the first prong of the alleged scheme. JA6008. Notwithstanding counsel's repeated *suggestions* that individuals seeking COVID-19 tests need not be seen by a health care provider, JA0320, JA2419-2420, the government conceded that the visits were medically necessary. JA1216 (government: "We're not saying that providers shouldn't have met with the patient."). Undisputed evidence at trial established medical necessity as well. JA1665-1666 (testimony of only medical expert); JA5605 (Centers for Medicare & Medicaid ("CMS") and Centers for Disease Control and Prevention ("CDC") guidance urging providers to meet with patients at the time of testing, even if asymptomatic).

After the government abandoned its lack of medical necessity allegation, its entire case rested on whether Dr. Elfenbein improperly instructed DEC providers to code COVID-19-related visits at level 4. The government described the level 4 coding as the "lie" Dr. Elfenbein told to insurance companies to effectuate the alleged scheme to defraud. JA0319-0320. The government's theory thus hinged on whether level 4 codes misrepresented the office visits provided at DEC. JA0024.

**E/M Coding Rules During the Pandemic**

At the outset of the COVID-19 pandemic in early 2020, the codes for E/M visits were found in the 2020 CPT Manual, along with their descriptions and guidance concerning their application. JA4976-4997, JA0391. As relevant here, code 99204 required 3 components in 2020: "A comprehensive history; A comprehensive examination; [and] Medical decision making of moderate complexity." JA4988. The Manual provided a "typical"—though not required—time for such a visit, but also instructed that time was *not* to be considered in selecting the level of E/M services *except* when "counseling and/or coordination of care dominate[d] (more than 50%) [of] the encounter," JA4986, which neither party contended was true here.

In response to the rapidly spreading coronavirus, CMS relaxed the rules for E/M code selection, making "changes to Medicare payment rules" that would give practitioners "the broadest flexibility to use remote communications technology to avoid exposure risks[.]" JA5215. CMS changed its coding rules "to specify that the office/outpatient E/M level selection for [COVID-19-related] services when furnished via telehealth [could] be based on MDM *or* time," (emphasis added) and "remov[ed] any requirements regarding documentation of history and/or physical exam in the medical record." JA5203. Thus, from March 1, 2020 onward, the 2020

CPT Manual's rules requiring documentation of the history and/or physical exam did not apply to telemedicine.

In 2021 (the year of service for the patient encounters in all five counts), the CPT Manual significantly changed its E/M coding rules. For *all* office visits, code selection was no longer based on a "three key factors model" (history, exam, and MDM). JA0939-0940, JA4976-4997. Instead, providers were to code visits based on "medical decision making (MDM) ***or*** time," JA5002 (emphasis in original), as they had been doing for telehealth visits throughout the pandemic. The extent of the history and examination were eliminated as factors in code selection even for in-person visits, and, in fact, a history and examination were not required at all. "Office or other outpatient services include a medically appropriate history *and/or* physical examination, *when performed.* ... The extent of history and physical examination is *not an element in selection of the level* of office or other outpatient codes." JA5009 (emphasis added).

Under the 2021 CPT guidelines, an office visit assigned CPT code 99204—and coded based on MDM rather than time—required only "moderate" MDM. JA5016. To help providers determine what MDM to assign—whether "moderate" or something else—the 2021 CPT Manual included a new MDM chart, which broke down the levels of complexity into

three parts and quantified the requirements for each level and the various permutations that could satisfy them. JA5013-5014.

▶Table 2: Levels of Medical Decision Making (MDM)◀

| ▶Code | Level of MDM (Based on 2 out of 3 Elements of MDM) | Elements of Medical Decision Making | | |
| --- | --- | --- | --- | --- |
| | | Number and Complexity of Problems Addressed at the Encounter | Amount and/or Complexity of Data to be Reviewed and Analyzed *Each unique test, order, or document contributes to the combination of 2 or combination of 3 in Category 1 below. | Risk of Complications and/or Morbidity or Mortality of Patient Management |
| 99211 | N/A | N/A | N/A | N/A |
| 99202 99212 | Straightforward | Minimal • 1 self-limited or minor problem | Minimal or none | Minimal risk of morbidity from additional diagnostic testing or treatment |
| 99203 99213 | Low | Low • 2 or more self-limited or minor problems; or • 1 stable, chronic illness; or • 1 acute, uncomplicated illness or injury | Limited (Must meet the requirements of at least 1 of the 2 categories) Category 1: Tests and documents • Any combination of 2 from the following: ■ Review of prior external note(s) from each unique source*; ■ Review of the result(s) of each unique test*; ■ Ordering of each unique test* or Category 2: Assessment requiring an independent historian(s) (For the categories of independent interpretation of tests and discussion of management or test interpretation, see moderate or high) | Low risk of morbidity from additional diagnostic testing or treatment |
| 99204 99214 | Moderate | Moderate • 1 or more chronic illnesses with exacerbation, progression, or side effects of treatment; or • 2 or more stable, chronic illnesses; or • 1 undiagnosed new problem with uncertain prognosis; or • 1 acute illness with systemic symptoms; or • 1 acute, complicated injury | Moderate (Must meet the requirements of at least 1 out of 3 categories) Category 1: Tests, documents, or independent historian(s) • Any combination of 3 from the following: ■ Review of prior external note(s) from each unique source*; ■ Review of the result(s) of each unique test*; ■ Ordering of each unique test*; ■ Assessment requiring an independent historian(s) or Category 2: Independent interpretation of tests • Independent interpretation of a test performed by another physician/other qualified health care professional (not separately reported); or Category 3: Discussion of management or test interpretation • Discussion of management or test interpretation with external physician/other qualified health care professional/appropriate source (not separately reported) | Moderate risk of morbidity from additional diagnostic testing or treatment Examples only: • Prescription drug management • Decision regarding minor surgery with identified patient or procedure risk factors • Decision regarding elective major surgery without identified patient or procedure risk factors • Diagnosis or treatment significantly limited by social determinants of health |

JA5013; *see also* JA5014 (MDM table for CPT level 5).

Under both the 2020 and 2021 CPT Manuals, the correct code for a particular service could not be determined from review of the Manual alone. In 2020, critical terms like "moderate" and "comprehensive" were undefined. The government's expert witness, Stephen Quindoza, acknowledged that "determining the complexity of medical decision making … [is] not just something that a coder or a provider determines based on the words[.]" JA0490. Quindoza agreed there were "gaps" in the CPT Manual, JA0460, and that the guidance designed to fill those gaps was, at times, inconsistent. JA0460-0464. Former DEC biller and coder Cathy Raymond acknowledged that providers had to contend not only with the CPT Manual to determine an appropriate code, but also with "the audit tools that Novitas had put out[.]"[4] JA0939-0940, JA4968-4971.

**Code Selection at DEC**

At the outset of the pandemic, when DEC first began seeing COVID-19 patients, there was internal confusion about how to code the visits, especially for telehealth. JA4436-4437, JA5054-5055. It was, as Raymond explained at trial, a "rapidly changing regulatory environment," and she "considered

---

[4]   Novitas is a CMS contractor that administers Medicare, including determining whether to pay claims, for the region that includes Maryland. Novitas publishes guidance for use by providers in submitting claims. JA0453, JA0940, JA1746.

multiple different code options to see which one actually and accurately described the service and which one would be compliant[.]" JA0874. Raymond initially suggested "billing lower level office visit codes," JA4436, but also said that telemedicine visits accompanied by visual exams could be a "a solid [level] 3." JA5054. She was "okay" with billing COVID-related visits at levels 4 and 5, "[i]f I had the documentation to support it in the history and the exam." JA0947, JA4438-4439.[5]

By April 2020, based, in part, on recommendations from DEC's co-owner, Dr. Elfenbein was instructing DEC providers to bill asymptomatic patients presenting for COVID-19 tests at level 4, and symptomatic patients at level 5. JA4441. Dr. Elfenbein later analyzed the applicable rules and guidance to confirm these were the appropriate billing levels. JA2170, JA2183-2184, JA2216-2217, JA2228, JA4438-4439. He concluded that level 4 was correct for COVID-19 patients in 2020 because, according to the Documentation Worksheet published by Novitas, JA4968-4971, the MDM is "moderate" where (1) a patient presents with a new problem for which testing is anticipated; (2) clinical lab testing is performed; (3) the presenting

---

[5] As discussed *infra* pp. 30, 56-57, Raymond's focus on documentation demonstrates the limitations of her testimony, as it reflects a coding rubric that did not apply for telehealth visits at any time after March 1, 2020, or for any visits, including in-person ones, in 2021, when the visits on which the substantive counts are based occurred.

problem is an "undiagnosed new problem with uncertain prognosis"; and (4) the management options (*i.e.*, recommendations to patients) are minimal. JA2227-2232.[6]

For 2021, Dr. Elfenbein consulted the MDM chart that appeared in the 2021 CPT Manual. JA2236-2238, JA4972. In the first column, "Number and Complexity of Problems Addressed at the Encounter," JA4972, JA5013, Dr. Elfenbein selected "undiagnosed new problem with uncertain prognosis." JA2238. In the second column, "Amount and/or Complexity of Data to be Reviewed and Analyzed," JA4972, JA5013, Dr. Elfenbein noted that two "unique test[s]" were ordered (the rapid and the PCR tests), and that the provider reviewed results of one of those tests (the rapid). JA2238-2239. In the third column, "Risk of Complication and/or Morbidity or Mortality of Patient Management," Dr. Elfenbein believed "Minimal" or "Low" applied "for the vast majority of our COVID patients," JA2239 but because both columns one and two fell in the "Moderate" row, and the ultimate MDM level was "based on 2 out of 3 Elements of MDM," JA4972, JA5013, Dr. Elfenbein concluded that patients presenting for COVID-19 testing should be coded at

---

[6] Dr. Elfenbein's review of the Novitas worksheet also confirmed that, when performed, the patient history and exam would support level 4. JA2218-2224. Because CMS removed the requirement for documenting the history and exam for telehealth visits, however, providers were instructed to code solely based on MDM. JA5203.

level 4, JA2239, as confirmed by the only expert who testified about DEC's coding. JA1764-1765, JA1791, JA1860-1864, JA1871.



*Note: arrows, boxes, and "x2" supplied to illustrate.

JA6016 (annotations provided by the district court).

### DEC Employees' Testimony About Coding

At some point before her resignation in October 2020, Cathy Raymond became concerned with what she perceived as a "pattern of over coding." JA0950-0952. She expressed specific concerns about the use of level 5 (not level 4). JA0950-0952. Raymond was not present at patient encounters, JA0980, and her concerns centered on what she believed to be insufficient

documentation. JA0992, which she thought supported billing at level 3. *See* JA0951.[7]

Deborah Needle, one of two DEC providers the government called, had no prior coding experience, JA1036, but "didn't *feel* that an asymptomatic patient warranted a level 4." JA1041 (emphasis added), JA1108-1109. Needle left DEC by the end of 2020, JA1078, before the change in the coding rules in 2021, when all five substantive counts occurred. Kathleen Wrona, the government's other provider witness, similarly had no coding experience, JA1389, and did not express discomfort with level 4 coding. JA1389-1391.

Steven Carroll and Suzana Silva, DEC providers called by the defense, testified that they billed their COVID-related visits at a level 4 because they believed level 4 accurately reflected their services. *See* JA1613-1614, JA1963-1964. Silva was familiar with E/M coding and chose level 4 based on her own experience. Carroll's contemporaneous belief that level 4 was appropriate was supported by his independent review of coding guidelines. JA1613-1614.[8]

---

[7] Raymond did not, as the government claims without citation, "indicate[] that 99211 (specimen collection) was the most appropriate code because that is ultimately what the Clinic was doing[.]" Br. at 35.

[8] Carroll testified that he later concluded that the code was wrong in one case—not, as the government claims, that level 4 codes were wrong for all COVID-related visits. *See infra* p. 30.

## The CareFirst Audits

In late 2021 and early 2022, CareFirst BlueCross BlueShield conducted two audits on a subset of DEC records. JA1172-1173, JA1177. CareFirst representative Courtney Sinagra (who the government did not qualify as an expert, and who did not perform either audit) was called by the government to summarize their results. JA1171-1172. The first audit involved a review of 30 incomplete patient records, JA1173-1176, JA4407-4430, and the auditor's conclusion was that the visits—which were coded at level 4—should have been coded at level 3. *See* JA1255-1256, JA1273-1274.

The second audit involved a review of 89 patient records from roughly the same time period as the first audit. JA1177. This time, a different CareFirst auditor concluded that the visits should have been coded at level 2. JA1196-1199. Sinagra explained that "auditors don't necessarily make the same findings as to specific claims," and "a one-level difference would not … necessarily be out of the ordinary." JA1292-1293.

## The Alleged "Executions" of the Scheme

Each of the five counts in the Superseding Indictment corresponded to a specific 2021 patient encounter that the government contended was improperly coded at level 4. JA0025. Accordingly, E/M codes could be selected based *either* on the length of the visit *or* on the level of medical decision making. JA5011. No history or physical examination was required,

and because all five counts occurred via telehealth, there were no "requirements regarding documentation of history and/or physician exam in the medical record." JA5203.

*Count 5:* S.T. visited DEC on April 19, 2021 due to an exposure to her COVID-positive daughter. JA1022. S.T. received both a rapid test and a PCR test. JA1004. Her recollection of the visit was limited, but she testified that she saw a provider via telehealth; the visit was brief; and it included discussion about why she came to DEC and whether she had symptoms. JA1003.

Medical records showed that the provider S.T. saw was Alyssa Suchar, JA3776, who the government did not call. The medical records indicate (1) that S.T.'s presenting problem was possible COVID exposure; (2) that she received one rapid and one PCR test; and (3) that the results of the rapid test were reviewed on the same day as her visit. JA3776-3777. On these points, S.T.'s testimony and the medical records were consistent.

*Count 4:* J.J. visited DEC on March 2, 2021 because she was exposed and had symptoms. JA1146, JA1151-1152, JA1159. She testified that someone swabbed her nose, JA1153, JA1157; that she saw a provider; and that the visit was short, JA1149, JA1152-1153. J.J. agreed that due to the passage of time,

"it's possible there were things that happened at that visit that [she didn't] specifically remember." JA1160.

Medical records reflected that J.J. saw a provider named Nikita Shah, JA3696, who the government did not call. The medical records indicate (1) that J.J. had a COVID exposure; (2) that she received two COVID tests, one rapid and one PCR; and (3) that the results of her rapid test were reviewed on the same day as her visit. JA3697-3698. J.J.'s limited recollection of her visit was not inconsistent on these points. Her triage form, completed in her writing, reflects that she had fatigue, nasal congestion, headaches, and sweats, and suffered from asthma. JA3699, JA1159-1160.

*Count 3:* D.M. visited DEC in May 2021. JA0844. She testified that her nose was swabbed; that she saw a doctor on a screen; and that the visit "wasn't long." JA0845-0846. D.M. remembered receiving two tests but remembered little else. JA0846-0847. D.M. acknowledged completing paperwork indicating that she had been exposed to COVID. JA0850-0851.

According to medical records, D.M. saw a provider named Sunday Laird. JA3672. Laird did not testify. Medical records indicate (1) that D.M. had a COVID exposure; (2) that she received two COVID tests, one rapid and one PCR; and (3) that the results of D.M.'s rapid test were reviewed on the

same day as her visit. JA3672-3673. D.M.'s limited recollection of her visit was not inconsistent on these points.

*Count 2:* W.R. did not testify at trial. Instead, his daughter S.T. (Count 5), who accompanied her father, testified to her memory of his visit. S.T. testified that W.R. was exposed to S.T.'s COVID-positive daughter. JA1009. S.T. testified that W.R. saw a provider via telehealth, that he had a conversation with that provider, and that the conversation was brief. JA1010.

W.R.'s medical record indicates that he was seen by Kathleen Wrona, the only provider for any of the counts who the government called. JA3752. Wrona did not testify about the decisions she made during W.R.'s visit, specifically, JA1346-1349, JA1403-1408, but she testified about the information she considered and the types of decisions she made during COVID-related visits generally, JA1371-1373, JA1377. Although W.R.'s medical records—which indicated an in-person physical exam—differed from S.T.'s recollection that her father had a telehealth visit, the existence or extent of a physical exam was irrelevant to code selection in 2021. The records indicate that W.R. was exposed to COVID and received two tests; on these points, the record is not inconsistent with S.T.'s testimony.

*Count 1:* Unlike every other patient who testified at trial, A.H. testified that she did not see a provider at all, JA0696, though she confirmed that she

came to DEC with a sore throat. JA0671, JA0674. Her medical records indicate that she had a visit with Sunday Laird. JA3648. Laird did not testify, and the government presented the jury with no explanation as to why she would complete and sign a chart for an office visit that did not occur.[9]

## Testimony of Coding Experts

The government's sole expert witness at trial, Stephen Quindoza, was qualified as an expert in "Medicare processes, rules, and regulations," and "procedural and diagnostic coding." JA0361. But he did not offer "any opinions concerning the medical necessity of a particular patient's E/M visit," JA0425, nor any opinions "concerning the care of any patient or all patients received" at DEC. JA0425. He reviewed no DEC medical charts, spoke to no patients, and offered no testimony concerning the correct CPT code for any office visit, including the five indictment count visits. JA0425-0426. Instead, Quindoza read the CPT Manual definitions for level 4 codes to the jury, JA0393-0394; testified about the existence of a COVID-19 test specimen collection code (99211), JA0401; and provided the jury with *incorrect* testimony about the relevance of time to CPT code selection and about pandemic-era changes to the rules—testimony he later acknowledged

---

[9] The jury also heard evidence that A.H.'s recollection of events may have been faulty. For example, A.H. was adamant that her vitals were not taken despite handwritten vital signs in her record. JA0693-0694, JA3664.

had been wrong, admitting that he had never read any of the three regulations promulgated by CMS during the pandemic concerning coding and COVID-19 testing. JA0404-0405, JA0504-0519, JA0581-0585, JA0595-0596. *See* pp. 26-28 *infra*.

Defense expert Michael Miscoe, who was qualified as an expert in medical coding, E/M coding, diagnostic coding, and documentation of medical services in medical records, JA1723-1724, reviewed the patients' charts for each count and testified that all five were properly coded at level 4. JA1791, JA1860-1864, JA1871. *See* pp. 28-29 *infra*. No government witness, expert or otherwise, offered testimony that any of these visits were improperly coded at level 4.

### The Verdict and Judgment of Acquittal

The Court denied Dr. Elfenbein's motions for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 at the close of the government's case and all evidence. JA1549-1564, JA2332-2333. On August 4, 2023, the jury returned guilty verdicts on all five counts. Dr. Elfenbein timely moved for a judgment of acquittal or, in the alternative, a new trial under Rules 29 and 33. After extensive briefing, the district court issued a 90-page opinion granting Dr. Elfenbein's Motion for Judgment of Acquittal and conditionally granting his Motion for a New Trial. JA5958-6050.

# ARGUMENT

## I.   The district court properly granted a Judgment of Acquittal.

The district court did not, as the government claims, "lightly cast aside" the jury's verdict. *Compare* Appellant's Brief ("Br.") at 1 *with* JA6049. Instead, after careful review of the evidence, viewed in the light most favorable to the government, the district court concluded that this was the "rare case" that cleared the "extremely high bar" set by Federal Rule of Criminal Procedure 29 for entry of judgment of acquittal. JA6049. The district court's conclusion was correct, and for the reasons explained below, this Court should affirm.

### A. Standard of Review

"[T]he court on the defendant's motion *must* enter a judgment of acquittal for any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a) (emphasis added). The "critical inquiry" in determining whether a Rule 29 motion should be granted "is whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318 (1979). In making this determination, "the court views the evidence and inferences therefrom

in the light most favorable to the government." *United States v. Rafiekian*, 68 F.4th 177, 186 (4th Cir. 2023) (internal quotation marks omitted).

A district court properly enters judgment of acquittal where the government fails to prove an "an essential element of the crime charged." *United States v. Burroughs*, 564 F.2d 1111, 1116 (4th Cir. 1977), *abrogated on other grounds, United States v. Steed*, 674 F.2d 284, 285 n.2 (4th Cir. 1982); *see also United States v. Selbe*, 27 F.3d 564 (4th Cir. 1994) (unpublished) (Table).

A district court's grant of judgment of acquittal is reviewed de novo. *United States v. Millender*, 970 F.3d 523, 528 (4th Cir. 2020).

## B. The government failed to prove the falsity of the level 4 coding.

The government charged Dr. Elfenbein with a scheme to defraud Medicare and other insurers through the submission of false claims for provider visits that occurred alongside COVID-19 testing—claims that the government contended were false because the visits were coded at level 4 despite not meeting the requirements for that level. The district court granted Dr. Elfenbein's motion for judgment of acquittal because "the Government did not carry its burden to prove beyond a reasonable doubt the falsity of the level 4 billing" and because the evidence was "insufficient to establish, beyond a reasonable doubt, that the level 4 codes used to describe

the five encounters that drew charges in the Indictment were false or fraudulent." JA6006-6007.

The district court's decision was *not* premised on a finding that the CPT Manual is so vague that "upcoding" can *never* form the basis of a health care fraud conviction. JA6014, JA6042. The court instead concluded that when the government charges an individual with breaking a "complex set of rules," it must prove beyond a reasonable doubt that the rules were, in fact, broken. JA6014. Because the government failed to do so, "acquittal [was] 'the *only* proper verdict.'" *Rafiekian*, 68 F.4th at 186 (quoting *Tibbs v. Florida*, 457 U.S. 31, 42 (1982)).

### i. The rules and guidance for CPT code selection are ambiguous, and the government offered no evidence to resolve the ambiguity.

As the Second Circuit has observed, "making a proper Medicare claim [is] a battle against the bewitchment of [one's] intelligence by means of bureaucracy." *United States v. Siddiqi*, 959 F.2d 1167, 1168 (2d Cir. 1992) ("*Siddiqi I*") (ordering a new trial where the case "revolve[d] around the code number '96500'" and "no one … seem[ed] to know exactly what '96500' means"). CPT code selection is governed by a complex set of rules, some of which are found within the CPT Manual and some of which are not. Every trial witness who testified about CPT coding—both government and

defense—agreed that code selection is informed, and sometimes modified, by multiple sources. *See, e.g.,* JA0490, JA0939-0940. The sources sometimes conflict. JA0460-0464. Careful application of the coding guidance to actual patient encounters can lead to different results, even by trained auditors. JA1292-1293.

In this case, the government chose not to contend with the inherent complexities of healthcare reimbursement. The government instead relied on the plain language of the CPT Manual code definitions, severed from accompanying guidance and binding regulatory authority. But the code definitions are, on their face, subject to multiple interpretations. For example, in 2021, a level 4 office visit coded based on MDM was one in which the provider employed "moderate" medical decision making. JA5013. "Moderate," already an imprecise term, cannot be applied to "medical decision making," equally imprecise, based on the plain English meaning of the terms. Instead, the CPT Manual includes a "Levels of Medical Decision Making" table as "a guide to assist in selecting the level of MDM." JA5012. Level 4, and each level of MDM, requires any "two of the three elements": the "number and complexity of problems addressed at the encounter," the "amount and/or complexity of data reviewed and analyzed," and the "risk of complications and/or morbidity or mortality." JA5012. Each of those

elements included several sub-parts identified in the table, JA5013-5014, and many of those subparts were defined elsewhere. JA5009-5012. Numerous different permutations could therefore establish moderate MDM. JA5013-5014. The 2021 CPT Manual provided more guidance on the meaning of "moderate" than the 2020 Manual, JA4986, JA4988, JA5013, but even in 2021, key phrases of the MDM elements, like "undiagnosed new problem of uncertain prognosis," remained largely undefined. The government presented *no* evidence, expert or otherwise, as to what these terms mean.

The government's own evidence establishes the very ambiguity it so strenuously denies. Br. at 31. Quindoza, the government's sole expert witness, agreed that "determining the complexity of medical decision making [is] not just something that a coder or a provider determines based on the words[.]" JA0490. As Courtney Sinagra's testimony revealed, trained auditors can review records of the same type, created during the same timeframe, and reach different coding results. JA1255-1256, JA1273-1274, JA1197-1199. Adding to the confusion, notwithstanding the fact that the government told the jury in its closing argument that it did not need to decide what level was appropriate other than to conclude it was not level 4, JA2358, it now insists DEC should have billed COVID-19-related provider visits at

level 1, Br. at 35, 37, 44, a position no government witness took, JA0951, JA1108-1109, and is in conflict with CMS regulations. *See infra* pp. 27 n.10, 39-40. Accordingly, the district court properly concluded that "there can be no serious debate that selecting the correct CPT code ... is somewhat ambiguous." JA6018.

### ii. No expert testimony established that level 4 was incorrect as applied to the services at issue.

In light of this ambiguity, and in an effort to establish the complex rules governing E/M code selection, the government presented the testimony of one expert witness, Stephen Quindoza. Expert testimony was necessary because, "[t]he ordinary juror is not expected to have knowledge regarding CPT codes[.]" *Counts v. Pollock*, No. 3:18-cv-1072-J-39JBT, 2020 WL 5534444, at *3 (M.D. Fla. Aug. 21, 2020); *see also United States v. Diaz*, No. 07-20398-CR, 2008 WL 906725, at *6 (S.D. Fla. Mar. 28, 2008) ("Medicare billing codes ... [are] beyond the knowledge of an ordinary juror.").

Quindoza was qualified as an expert in "Medicare processes, rules, and regulations," and "procedural and diagnostic coding," JA0361, but his testimony was limited in scope, *see supra* pp. 19-20, and he offered no opinions about the provider visits at issue in the case and did not even review any records. JA0425-0426. Instead, he testified about healthcare reimbursement and the requirements of the CPT Manual at a high level of

generality. Even on these foundational points, however, Quindoza's testimony was riddled with errors.

For example, Quindoza admitted on cross-examination that his testimony that the length of a visit dictated E/M code selection was "just not true." JA0504. And with respect to pandemic-era coding guidance, Quindoza admitted he had read none of the three regulations and guidance that CMS published in the federal register during 2020 as it changed the coding rules in response to the pandemic. JA0585, JA0595-0596. He was unaware that as of March 2020, CMS "remove[d] any requirements regarding documentation of history and/or physical exam in the medical record" for telemedicine. JA0578, JA0581, JA5203, JA5215.[10]

Thus, the district court did not, as the government claims, improperly "disregard[]" Quindoza's testimony about whether level 4 accurately described the services provided at DEC. Br. at 26. On that subject, Quindoza simply had nothing to offer. The testimony on which the government now relies—that Quindoza "indicated that a Level 4 was not proper for visits lasting less than five minutes where complex medical decisionmaking was not performed," Br. at 25-26 (citing JA0661-0662)—is nothing more than a

---

[10]  Quindoza was also unaware of a May 8, 2020 Interim Final Rule making clear that code 99211 (level 1) applied only when the patient does not interact with a provider at all. JA0621-0622, JA5503; *see infra* pp. 39-40.

misleading reformulation of the 2020 CPT Manual's brief code definitions; it incorrectly suggests that time was relevant to level selection, *see infra* pp. 40-41, and it is fails to account for CMS's modification of the rules for telemedicine. Quindoza did not explain how to apply other provisions in the CPT Manual that showed how to determine whether medical decision making was moderate.

The only other expert who testified regarding CPT coding was the defense expert, Michael Miscoe. Miscoe testified that the 2020 CPT Manual included numerous undefined terms, the meaning of which could not be determined from review of the Manual itself. JA1734-1740. His uncontradicted expert opinion was that, under the applicable coding guidance, COVID was an "undiagnosed new problem with an uncertain prognosis," a term that established one of two requirements in 2021 for moderate MDM, and therefore a level 4 office visit. JA1764-1765, JA5013.[11]

---

[11] Miscoe testified that CMS's "Official Guidelines" regarding the use of COVID diagnostic codes, JA5585, instructed providers and coders not to use the new COVID screening code during the pandemic, but instead, to assign to all COVID tests for which there was not a confirmed COVID diagnosis—even encounters for, *e.g.*, travel—the code for "actual or suspected exposure to COVID-19." JA1764-1765. The guidance instructed that, "given the Public Health Emergency, … everybody was suspected to have COVID until it was proven that they did not." JA1765-1766, JA5591.

Moreover, unlike Quindoza, the government's only expert witness, Miscoe offered expert testimony regarding the coding of specific DEC visits: the five visits that were the subject of indictment counts and a number of others. His opinion was that the charts supported the level 4 codes. JA1791, JA1860-1864, JA1871.

As the district court explained, "[t]he jury clearly did not credit Miscoe's testimony, and they were, of course, entitled to do so." JA6027. But Miscoe's testimony threw into sharp relief what the government's expert did not prove, a point not lost on the district court:

> The Government did not present testimony with respect to the definition of an "undiagnosed new problem with uncertain prognosis," whether presenting for a COVID-19 test in 2020 or 2021 qualified as such a problem, or whether two COVID-19 tests and reviewing the results of those tests met the requisite threshold. Here, **the Court is not weighing the testimony of two different experts**—*something the Court is not permitted to do* in ascertaining the sufficiency of the evidence. *Rather, the Government provided no expert testimony regarding these highly relevant issues at all.*

JA6027 (emphasis added). The district court correctly concluded that Mr. Quindoza's testimony did not establish, or even address, the falsity of the level 4 coding.

### iii. No other testimony established that level 4 was wrong.

The government contends that the testimony of non-experts Cathy Raymond, Deborah Needle, Steven Carroll, and Courtney Sinagra proved that level 4 was the wrong code, and that the district court failed to "credit" their testimony. Br. at 27. Not so.

Although Raymond testified that she raised concerns to Dr. Elfenbein that, "the *documentation level* that was there did not justify the high level office visits," *see* JA0861 (emphasis added), she was "okay" with billing COVID-related visits at levels 4 and 5, "[i]f I had the documentation to support it in the history and the exam." JA0947; *see also* JA4438-4439. At no point did she testify that the visits at issue did not involve moderate levels of medical decision making. Nor did she testify about DEC's coding practices in 2021 when the visits that make up the substantive counts occurred, and by which time "[t]he extent of history and physical examination [was] not an element in selection of the level of office or other outpatient codes." JA5009. *See supra* pp. 7-10.

Needle offered even less relevant testimony on this critical point. She had no coding experience and was "[n]ot really" familiar with E/M codes. JA1036. She nevertheless testified, without grounding in any rules or regulations, that she "didn't *feel* that an asymptomatic patient warranted a

level 4," JA1041 (emphasis added), JA1044. She too left DEC in 2020 and did not testify about coding practices in 2021.

Carroll testified that he *agreed* with DEC's coding practices, and that he chose to code COVID-19-related visits at level 4 because he believed it was correct, based on his independent review of coding guidelines. JA1613-1614. Contrary to the government's assertion, Carroll did not testify that, "he later came to believe that the Clinic had wrongly coded the visits as Level 4's." Br. at 27. His actual testimony was that, with respect to one specific encounter, he no longer agreed with the level 4 code he assigned, though he felt it was appropriate at the time. JA1634-1635.[12]

Sinagra, the CareFirst representative who summarized the DEC audits, agreed that the two audits reached different results; that the first was based on incomplete information; and that she did not know whether the complete records would have supported the level 4 coding. JA1270-1271. She acknowledged that, "auditors don't necessarily make the same findings as to specific claims," and "a one-level difference would not … necessarily be out of the ordinary." JA1292-1293. Moreover, Sinagra testified that COVID exposure "could be" considered "an undiagnosed problem of uncertain

---

[12]  This is the second time the government has mischaracterized Carroll's testimony, JA6035-6036, which certainly did not establish the falsity of the level 4 coding.

prognosis[.]" JA1314. In any event, her testimony concerning the correct codes carries no weight after the government limited the scope of her testimony to prevent any cross-examination concerning code selection.[13] Her testimony falls well short of establishing that level 4 was incorrect.

### iv. The "constellation" of other evidence of "a scheme to defraud" did not supply the missing proof that level 4 was the wrong code.

The government derides the district court's conclusion that the government failed to prove the indispensable element of falsity as a "fail[ure] to consider holistically the constellation of evidence which demonstrated a scheme to defraud." Br. at 27-28. The government even criticizes the district court—three times—for its "hyper-focus" on the CPT Manual, which, along with the regulations, contains the *rules* that control code selection. Br. at 22, 29, 46. It was the government's choice, however, to bring criminal charges premised on the alleged mismatch between level 4 coding and the services provided at DEC. It was, therefore, essential for the district court to carefully review the CPT Manual and the evidence surrounding it in analyzing whether the government proved beyond a reasonable doubt that the level 4 coding

---

[13] The government objected to defense counsel's examination as "beyond the scope" because "this witness is not being offered as an expert." JA1220-1222 Her testimony summarizing audits performed by others has no relevance to the correctness of the codes for that reason alone; it is only relevant to Dr. Elfenbein's state of mind, which is not an issue on appeal.

was false. JA6014, JA6008. The government's complaint about the focus on the CPT Manual betrays the government's recognition that it cannot prove the codes here were wrong.

In any event, nothing in the government's "constellation," Br. at 28-29, supplies the missing proof. As explained in Section I.D. *infra*, DEC providers' use of medical record templates is a red herring. Raymond's documentation concerns, and Needle's generalized and uninformed discomfort with DEC's coding practices, did not establish that level 4 was wrong. *See* Section I.B.iii. *supra*. Nor does the fact that DEC saw large volumes of patients during the pandemic, when patients were overwhelming healthcare providers. JA0653-0654. And the government's reference to state-of-mind evidence, Br. at 29, does not relieve the government of its burden to prove falsity. In any event, Dr. Elfenbein's emphasis on CPT coding as central to medical billing is nothing sinister—it is an accurate statement of how healthcare is paid for in this country, as government witnesses testified. *See, e.g.,* JA0939 (Cathy Raymond agreeing that "there's nothing unusual" about "trying to find the best code" that was "[c]ompliant with the service that was performed in order to maximize the reimbursement").

The government's evidence that *other* urgent care centers billed fewer level 4 visits is yet another red herring. The government reproduces an

illustration from DEC's outside billing company, BlueFish, showing that DEC billed more level 4 codes than the national average and argues, "the jury was entitled to … conclude that Elfenbein's interpretation of the CPT manual was unreasonable." Br. at 37-39. The cited analysis, however, states on its face that, "[p]hysicians should never try and adjust coding to mirror the national averages; these are simply used as guides." JA4541.[14] Even if pattern evidence were relevant, BlueFish's President testified that he "believe[d]" the national averages came from *pre-pandemic* data. JA0833-0835. It is entirely unsurprising that the number of level 4 visits would rise with the onset of a public health emergency. JA0653-0654, JA1865. The stale "national average" benchmark does not even prove that DEC was an outlier during the pandemic, let alone that level 4 was wrong.

Finally, the government's suggestion that "holistic" review of a "constellation of evidence" can fill the gaping hole in its case echoes its argument below that evidence of *scienter* suffices to prove *falsity*. JA5899-5900. The district court properly rejected that argument. JA6009-6010 ("The Government's argument is perilously close to advocating for a conviction to stand based on the Defendant's *mens rea* alone.").

---

[14] The government reproduces the charts from this analysis but omits the cautionary notice that appears just below them. JA4541.

## C. The government's substitution of "common sense" for evidence that level 4 was incorrect contravened the controlling rules.

Having failed to establish the falsity of the level 4 codes, the government told the jury that proper code selection was a matter of common sense. JA2422. In its brief opposing Dr. Elfenbein's Motion for Judgment of Acquittal, the government argued that "[t]he code is written in English and the Defendant's instructions do not meet the definition of a Level 4," and that Dr. Elfenbein's alternate interpretation did not pass the "smell test." JA5892, JA5910. On appeal, the government avoids phrases like "common sense" and "smell test." But its falsity argument suffers from the same deficiencies it did before.

The government acknowledges that in 2021, a visit was properly coded at level 4 if the provider employed "moderate complexity" MDM. Br. at 32. The MDM table in the 2021 CPT Manual, *supra* p. 9, provides that a visit qualifies as level 4 if the patient presents with (1) "1 diagnosed new problem with uncertain prognosis" and (2) the patient receives two "unique test[s]," one of which is reviewed by the provider. JA5013; *see also* JA6016. The government argues that the jury properly found that level 4 did not describe the visits at issue because, "most patients did not have a medical 'problem' at all. Rather they were there to receive a test so they could travel or attend

sports." Br. at 32.[15] This rhetoric is unsupported by evidence. Not a single witness testified that "most" DEC patients sought tests for travel or sports. The government did not conduct any review—much less a comprehensive or statistically valid one—of DEC patient files to make such a determination, nor did it engage an expert to do so. *Cf. United States v. Janati*, 237 F. App'x 843, 845 (4th Cir.), *cert. denied*, 552 U.S. 1055 (2007) ("*Janati II*") ("upcoding" case in which the government's expert analyzed hundreds of the claims alleged to be false).

In baldly asserting that patients did not come to DEC with "actual COVID symptoms," Br. at 32, the government forgets that two of the patients whose encounters correspond to specific charged counts *presented with COVID symptoms*. JA3699, JA1146, JA1151-1152, JA1159 (J.J.); JA0671, JA3664 (A.H.).[16] The other three patients all had been exposed to COVID-19. JA0851 (D.M.), JA1016-1017, JA1019 (S.T./W.R.). The government may minimize those exposures now, but CMS and the CDC instructed providers in July 2020 that because "symptomatic, pre-symptomatic and

---

[15]  The government cites to the testimony of Kathleen Wrona, who agreed she "saw many patients that needed a test to travel." JA1344-1345. Wrona did not say "most."

[16]  A.H. had no recollection of seeing a provider but did not dispute that she presented to DEC with a sore throat. JA0671, JA0674.

asymptomatic individuals" could transmit the virus, its spread could be reduced if medical professionals saw patients at the time of testing to counsel them concerning the importance of quarantine before symptoms arose. JA5604. CMS and CDC were clear that "physicians and other practitioners who counsel patients on COVID–19 testing [should be] paid for these services." JA5549.

The government argues further that a patient presenting for a COVID-19 test does not have an "undiagnosed new problem with uncertain prognosis" because suspected COVID is not similar to a "lump in the breast," the example provided in the CPT Manual. Br. at 33. Not a single witness testified that COVID-19 was *not* an undiagnosed new problem of uncertain prognosis. *See, e.g.*, JA1314 (Courtney Sinagra: COVID exposure "could be" considered "an undiagnosed problem of uncertain prognosis"). As for whether suspected COVID-19 could be in the same category as a "lump in the breast," the government provided the jury with *no evidence on this point whatsoever*, appealing only to the jury's "common sense" in closing argument. JA2347, JA2424.[17] Nor does the government suggest an

---

[17] While the jury was not required to credit his testimony, defense expert Michael Miscoe pointed out how the two conditions *were* similar. *See* JA1926-1928 (testifying that a lump in a breast is an undiagnosed condition of uncertain prognosis, comparable to undiagnosed COVID, because COVID is "an undiagnosed new problem that you don't know what's going to happen

alternative among the choices in the CPT Manual that could apply to a COVID patient being tested.[18]

The government next argues that ordering two unique tests and reviewing one of them cannot support level 4 coding because, "'the amount and complexity' of the data was not great." Br. at 35. Again, the government's argument is untethered completely from the CPT Manual, which specifies how to determine the amount and complexity of data. JA5011. Under these binding rules, ordering two tests and reviewing one meets the requirements for a moderate amount and complexity of data. JA5013. The government advanced this argument for the first time in its opening brief and provided the jury with no evidence that analysis of COVID-19 tests was or was not "great," an invented standard anyway.[19]

---

with it, in terms of the risk of compromise of health or bodily function, without treatment," like lumps in the breast, many of which "turn out to be benign").

[18] Alternatives are shown in the MDM chart in the "Number and Complexity of Problems" column, JA5013-5014, and defined in the CPT Manual. JA5009-5010. None of the alternatives is applicable, as Miscoe, the only witness who addressed the issue, explained. JA1770-1772.

[19] The government's argument that the third element of MDM is not satisfied because asymptomatic COVID-19 patients had "no risk of morbidity or mortality," Br. at 35, is yet another red herring. The level of MDM required only two of the three elements, JA5012, JA5013, and DEC coded based on the application of the first two elements, JA2239. The risk of morbidity or mortality was immaterial.

The government's argument on appeal is, in substance, the same argument it made below: that the brief code definitions should be read in isolation and construed based on the government's own view of what reimbursement rules make sense. The government asked the jury to convict Dr. Elfenbein on precisely this basis. But the government cannot pick and choose among the controlling rules, excluding the CPT Manual's guidelines that explain how to interpret and apply the definitions and the controlling regulations and guidance that superseded the CPT Manual during the pandemic. The lawlessness of the government's approach is laid bare by its repeated insistence—at trial and again on appeal—that level 1 was the proper code for the visits at issue because it covers "specimen collection," JA2420; Br. at 35, and that the visits were too short to be level 4, Br. at 10, 18, 32. But CMS's May 8, 2020 Interim Final Rule made clear that level 1 applied only when the patient does not interact with a provider at all, and clinical staff— such as a medical assistant—does nothing more than use a swab to acquire a specimen for testing. JA5503.[20] And the CPT Manual and regulations made clear that time was not a factor in selecting the code unless the provider chose to rely on it. JA4986, JA5002, JA5203, JA5122.

---

[20] A "clinical staff member," as defined in the CPT Manual, is not a provider, but a "person who works under the supervision of a physician or other qualified healthcare professional. JA5003.

The evidence is undisputed that the patient encounters at DEC involved more than clinical staff taking a swab. Every provider who testified at trial described encounters in which they reviewed patients' histories; examined them visually in the case of telehealth visits and physically if in person; determined whether to order additional or different tests than called for by the standing order; and advised patients concerning CDC guidelines for quarantining, symptoms of concern, and whether to follow up with their primary care physicians or go to the emergency room. JA1039, JA1092-1093, JA1376-1378, JA1630, JA1954-1955, JA1957-1958. There is no dispute that the provider visits were short. But the government ignores the testimony of its own witnesses by suggesting that the provider visits should be disregarded entirely and instead coded at level 1, as if nothing more happened than a medical assistant acquiring a swab. The district court correctly concluded that the government's level 1 argument was "not supported by the evidence presented at trial." JA6020.

As for the relevance of time, the government repeatedly argued that such short visits could not be level 4, while denying it was doing so. In opening statement, the government acknowledged that "[t]his case is … not about whether a level 4 office visit was required to take a certain amount of time." JA0326. But on direct examination of Stephen Quindoza, the

government elicited testimony from him that time was "a relevant factor in determining the appropriate CPT code[.]" JA0394. On cross examination, Quindoza was forced to acknowledge that time was *not*, in fact, a relevant factor. JA0504. The government continued questioning witnesses about the duration of visits, JA1003-1004, JA0846, JA1149, and argued in closing that level 4 visits were "typically 45-minute office visits." JA2422. These arguments were especially misleading because all five counts were telehealth visits in 2021, when the CPT Manual no longer included typical times and time was entirely irrelevant to code selection based on MDM. *See supra* pp. 8-10. As the district court correctly found, "there is no evidence that providers were to consider patient volume or time when utilizing the medical decision making chart to code visits." JA6030.

The government cites *United States v. Harra*, 985 F.3d 196, 216 (3d Cir. 2021), for the proposition that the jury was empowered to determine the reasonableness of Dr. Elfenbein's interpretation of the CPT Manual, even in the absence of evidence that the interpretation was incorrect. Br. at 30-31. As the government sees it, the jury weighed the government's and Defendant's view and "agreed with the government," concluding, "[t]his should end the matter." *Id.* But *Harra* does not say that. Indeed, the government's selective reliance on *Harra* ignores the government's

threshold burden to prove falsity, 985 F.3d at 214-15, and the district court's "substantial" role in holding the government to that burden, *id.* at 217.

In *Harra*, the government alleged a scheme involving false reporting of "past due" loans. 985 F.3d at 207. Relevant regulations of three different agencies did not define the term "past due," and "each described the reporting requirement in slightly different terms." *Id.* at 205. At trial, the government presented an interpretation of "past due" that relied on the "purported 'ordinary meaning'" of the term, *id.* at 207, 220, and the defense presented its alternative interpretation. *Id.* at 207. The jury convicted. *Id.* at 208. But on appeal, the Third Circuit did not simply leave it to the jury to choose between the competing interpretations. Rather, "to prove falsity beyond a reasonable doubt" in the context of such ambiguity, "the Government must prove either that its interpretation of the reporting requirement is the only objectively reasonable interpretation or that the defendant's statement was also false under the alternative, objectively reasonable interpretation." *Harra*, 985 F.3d at 204; *id.* at 214 (citing cases). The question of reasonableness is only for the jury if "the Government has introduced sufficient evidence of falsity under each reasonable interpretation ... to survive a Rule 29 motion." *Harra*, 985 F.3d at 217. Where

the government fails to meet this threshold burden, a jury conviction must be set aside. *See id.* at 220.[21]

The government failed to meet its burden here. It offered no evidence that the defense's interpretation was unreasonable—that level 4 did not accurately represent provider visits where a patient presented with an "undiagnosed new problem with uncertain prognosis" (suspected COVID-19) and received two tests, one of which was reviewed on the date of the encounter. And it offered no alternative interpretation or evidence supporting it. Without such evidence, the jury could not find the level 4 codes false, and therefore, could not find that the government proved the charged scheme. JA6038-6039. Nor could the jury conclude that the five indictment counts constituted executions of that scheme without proving that their level 4 codes were false. There is no dispute that S.T., J.J., D.M., and W.R. presented to DEC due to COVID exposure or symptoms, and that they

---

[21] The government also cites *United States v. Sarwari*, 669 F.3d 401, 407 (4th Cir. 2012), for the proposition that, where a question is not "fundamentally ambiguous," "the fact finder determines whether the defendant knew his statement was false." Br. at 30. But *Sarwari* involved *possible* ambiguity of the meaning of "father," *id.* at 410, a far cry from the "unquestionably ambiguous" coding scheme here. JA6013. And the government does precisely what *Sarwari* prohibits in pushing a "commonsense" reading of CPT code definitions "isolate[ed] … from [their] context." *Sarwari*, 669 F.3d at 408. The district court correctly concluded *Sarwari* did not control. JA6013.

received two tests, one of which the provider reviewed that day. JA6039-6040. Under the binding rules, that established that the level 4 codes were correct.[22]

### D. The government did not charge—or prove—a scheme to defraud based on "fake" medical records.

As the district court observed, "[t]he Government's theory of fraud in this case was not a model of clarity." JA6007. Perhaps it is unsurprising, then, that the government now asks this Court to find Dr. Elfenbein guilty of a scheme it did not charge. Scattered throughout the government's brief are references to "templates that caused medical records to contain false entries." *See, e.g.,* Br. at 19. For the first time, the government argues that these templates prove that Dr. Elfenbein committed health care fraud, "[r]egardless of the propriety [of] the selected CPT code[.]" Br. at 28.

The government did not charge Dr. Elfenbein with falsification of medical records. The case it charged—and the case it tried—centered on whether the provider visits that occurred alongside COVID-19 tests were properly coded at level 4. As the district court instructed the jury, consistent

---

[22] As for A.H.'s visit to DEC, if, notwithstanding her COVID-19 symptom and receipt of two tests, she did not see a provider, her visit alone was not properly coded at level 4. "Nevertheless, assuming she did not see a provider, that is simply *not an execution of the scheme the Government sought to prove.*" JA6041 (emphasis in original). Indeed, the government expressly disclaimed any scheme to bill for visits without a provider seeing the patient. JA1216.

with the parties' joint proposed instructions, "[t]he representations that the Government charges were made as part of the scheme are set forth in Paragraph 30 of the indictment[.]" ECF No. 34 (joint proposed jury instructions) (June 26, 2023); JA2456 (court's final instructions). Paragraph 30 makes no reference to "false entries" on medical charts. JA0023-0025. Instead, like the rest of the indictment, it makes clear that the allegedly false representations were the claims for "moderate complexity E/M Services in conjunction with COVID-19 tests"—*i.e.*, level 4's. JA0025. Paragraphs 25-27 explain the use of CPT codes and quote the definitions of level 4 codes during 2020-2021. In closing, the government asked the jury to convict because "Dr. Elfenbein told his nurse practitioners and his physician's assistants to do one thing and he told insurance companies that they were doing another. … *He was telling [insurance companies] that every patient that came to his drive-through testing sites to get a COVID test was also getting **a level 4 office visit**[.]" JA2414-2416 (emphasis added).

The government cannot distance itself from its own case (and create an entirely new one) to suit its needs on appeal. *Cf. Siddiqi v. United States*, 98 F.3d 1427, 1437-38 (2d Cir. 1996) ("*Siddiqi II*") ("The government's theory of criminal conduct has been a target that moves opportunistically when confronted by contrary evidence or telling argument. … We find the

ointment's fly in the failure of the government to settle upon a single theory of guilt and, then, at this final stage, in seizing upon a theory that is inadequate as a matter of law.").

In any event, the government's new theory suffers from several fatal flaws. *First*, there was no evidence that DEC's use of templates amounted to "falsification" of medical records. Numerous witnesses—both government and defense—testified that templates are ubiquitous and, indeed, can be helpful to providers. *See*, *e.g.*, JA093, JA1323, JA1610, JA1387. Unsurprisingly, Dr. Elfenbein created templates for providers, but so did Cathy Raymond, JA0931, JA5669. Suzana Silva created her own templates. JA1959-1960. There is nothing nefarious about a template containing prepopulated information—that is simply the definition of a template.

*Second*, while the evidence undoubtedly reflected some documentation errors, not a single provider testified to intentionally or routinely signing medical charts containing inaccurate information. *See, e.g.*, JA1962. With one of its provider witnesses, the government deliberately chose not to ask that question, disclaiming any contention that Dr. Elfenbein asked the provider to falsify medical records.[23] The government pointed out

---

[23] After eliciting testimony from Kathleen Wrona, the provider who saw W.R. (Count 2), that her charting of W.R.'s visit contained inaccuracies, JA1346-1349, the government objected to defense counsel's questions aimed at

some inconsistencies between medical records and certain patients' (admittedly limited) memories of their visits, JA1003, JA1150, JA1160, JA1162, JA0846-0847, JA1011, but it made no effort to prove that inaccuracies occurred as a matter of course.

*Third*, there is no evidence whatsoever that Dr. Elfenbein instructed providers to create medical records that inaccurately reflected their interactions with patients. Nor is there evidence that Dr. Elfenbein even mandated template use. Indeed, the evidence established the opposite. JA4458 (Dr. Elfenbein email: "be sure to actually ... DO THE THINGS you are documenting [in the charts]"); JA4497 (Dr. Elfenbein email: "[I]f you wanna continue using paper that's fine, just transcribe the information into the electric [*sic*] chart.").

In short, the government's attempt to revive its case based on a theory that was not charged, argued, or supported by any evidence fails.

### E. The government's cited cases do not support reversal of the district court's grant of judgment of acquittal.

The government cites no case, from this Circuit or elsewhere, in which a Court has upheld a conviction for health care fraud where the government

---

dispelling any suggestion the chart was intentionally falsified. JA1391-1394. The government objected on relevance grounds, noting that "the Government never elicited any testimony that Wrona was directed by Dr. Elfenbein to falsify medical records ... We never asked it." JA1394.

has failed to prove falsity, "the element on which the Government stumble[d] in this case." JA6013. And the cases the government *does* cite do not support reversal of the district court's entry of judgment of acquittal.

The government's reliance on this Court's decisions in *United States v. Palin*, 874 F.3d 418 (4th Cir. 2017), and *United States v. McLean*, 715 F.3d 129 (4th Cir. 2013), is curious, given that both cases rested on allegations of billing for medically unnecessary services, and the government abandoned its medical necessity theory here. In *Palin*, the main issue on appeal was whether the defendants' misrepresentations about the medical necessity of certain tests satisfied the materiality element of health care fraud. 874 F.3d at 421-23. The *Palin* defendants do not appear to have challenged the district court's finding that the tests were, in fact, unnecessary. *Id*. In *McLean*, the jury convicted the defendant of health care fraud premised on a scheme to bill for unnecessary procedures after hearing from two expert cardiologists, both of whom reviewed patient files and opined that the defendant routinely placed medically unnecessary stents in patients. 715 F.3d at 133-34. In neither case was there any shortage of evidence of falsity.

This Court's decision in *Janati II*, 237 F. App'x 843, at least involved "upcoding" allegations that the defendant challenged based on ambiguities in the CPT Manual. *Janati II*, 237 F. App'x at 845-46. But *Janati II* reveals

the extent to which the government cut corners here. *See* JA6043-6044 (citing *Janati II* as a case in which the government more "careful[ly] navigat[ed]" the "shallow waters" of health care fraud cases premised on ambiguous coding requirements). In affirming convictions for upcoding office visit claims, this Court noted that "[t]he government's expert on medical billing codes examined 471 office visits, including the visits which were the subject of the indictment," and determined that the code was not supported for any of them. 237 F. App'x at 845. The court acknowledged that "the Janatis correctly pointed out that selecting the proper billing code for a given visit required some judgment," *Janati II*, 237 F. App'x at 845, but the coding expert testified that "the visits that she examined were '[n]ot even close' to being properly classified at the Code 99215 level." *Id.*

The government's case against Dr. Elfenbein, by contrast, included *no* expert testimony about the appropriateness of the coding of even a single claim. The government's expert never reviewed any billing records, testified only generally about the code definitions, and even then acknowledged that his testimony had been incorrect because he was not familiar with CMS's pandemic regulations changing the coding rules. The only expert to review the medical records and offer an opinion about any of the claims at issue was

the defense expert, who concluded the codes were correct. JA1791, JA1860-1864, JA1871.

As for the out-of-Circuit authority on which the government relies, *United States v. Verdeza*, 69 F.4th 780 (11th Cir. 2023), and *United States v. Boesen*, 491 F.3d 852 (8th Cir. 2007), the government's characterization of these cases as involving "facts very similar to those presented here," Br. at 23-24, is absurd. *Verdaza* involved bribery of insured individuals who submitted themselves to cursory physical examinations, after which they were prescribed medically unnecessary physical therapy. 69 F.4th at 786. The "patients" signed forms attesting they received this therapy, though they often had not. *Id.* The healthcare clinics at the center of the scheme received insurance reimbursement for this medically unnecessary (and, often, nonexistent) physical therapy in exchange for kickbacks. *Id.* The defendant in *Verdeza* even *conceded* on appeal that health care fraud occurred and that he falsified patient evaluations. *Id.* at 788-89. The Eleventh Circuit rejected his contention that his conviction as an aider-and-abettor inaccurately described his role in the scheme, *id.*, based on evidence that he "was directly involved in falsifying the claims forms." *Id.* at 789.

*Boesen*, too, bears no resemblance to this case. There, the scheme involved billing for medically unnecessary procedures as well as procedures

that were not performed. 491 F.3d at 854. The district court granted the defendant's motion for judgment of acquittal *not* because the government failed to prove that health care fraud, but rather based on the court's conclusion that the defendant relied on the medical judgment of his brother (who was also convicted of fraud) and lacked the requisite *mens rea*. *Id.* at 855. The Eighth Circuit reversed, finding a reasonable jury could have found that the defendant did *not* act in good faith and instead conspired with his brother. *Id.* at 858.

The government cites no case in which a court has upheld a health care fraud conviction based on the submission of false claims where the government failed to prove falsity, or any other essential element. None exist.

*   *   *

The government's case thus lacked any evidence to support its allegations that Dr. Elfenbein "took advantage of the COVID-19 pandemic," JA0319, by telling providers to use CPT codes that were false. Instead, the government relied on atmospherics, pointing to the increase in DEC's patients during the pandemic and the corresponding increase in Dr. Elfenbein's income, which says nothing about falsity. Prosecutors then told the jury to disregard the binding rules for coding to find that "moderate

complexity medical decision making" could not possibly mean what the CPT Manual and regulations said it meant.

But the government is no less bound by CPT rules and CMS regulations than healthcare providers like Dr. Elfenbein. As the district court found, "to the extent there is an incongruity between coding outcomes and common sense, the fault lies with the drafters of the CPT Manual and related guidance." JA6042.

The government failed to offer evidence from which a jury could find falsity by any standard, much less beyond a reasonable doubt. The district court scrutinized the record with great care, mindful of the respect to which jury verdicts are entitled. It correctly concluded that the evidence was not sufficient to support the verdict and entered judgment of acquittal on all five counts. JA6006-6007, JA6051-6052; *United States v. Powell*, 469 U.S. 57, 67 (1984). This Court should affirm.

## II. The district court did not abuse its discretion in conditionally granting Dr. Elfenbein's motion for a new trial.

For the reasons explained above, "acquittal is 'the *only* proper verdict.'" *See Rafiekian,* 68 F.4th at 186 (quoting *Tibbs*, 457 U.S. at 42)). At minimum, however, the Court should affirm the district court's conditional grant of a new trial.

### A. The district court's ruling conditionally granting Dr. Elfenbein's motion for new trial is reviewed for abuse of discretion.

A district court's grant of a new trial motion is reviewed for abuse of discretion. *Rafiekian*, 68 F.4th at 187. This "highly deferential" standard recognizes that "appellate judges do not experience the tenor of the testimony at trial," and "owe the great deference commanded by the traditional power of trial judges sitting as 'thirteenth jurors,' to avoid possible miscarriages of justice by ordering new trials in criminal cases." *Id.* (cleaned up) (citations omitted).

### B. The district court soundly exercised its discretion in finding that it would be unjust to enter judgment.

Federal Rule of Criminal Procedure 33 provides that "the court may vacate any judgment and grant a new trial if the interest of justice so requires." In determining whether to order a new trial pursuant to Rule 33, the court "conducts its own assessment of the evidence, unconstrained by any requirement to construe the evidence in the government's favor." *Rafiekian*, 68 F.4th at 186 (quoting *United States v. Arrington*, 757 F.2d 1484, 1485 (4th Cir. 1985)). "[A] new trial based on the weight of the evidence is warranted '[w]hen the evidence weighs so heavily against the verdict that it would be unjust to enter judgment.'" *Id.*

The district court conditionally granted Dr. Elfenbein's motion for a new trial because, "having closely observed the testimony and parsed the evidence in this case, [it] conclude[d] that the evidence weighs so heavily against the verdict that it would be unjust to enter judgment." JA6048.[24] The district court's "global assessment of the evidence," JA6045 (quoting *Rafiekian*, 68 F.4th at 189), revealed that "the inculpatory evidence in this case is more atmospheric while the exculpatory evidence is grounded in the actual guidance that forms the foundation of this case." JA6048. Far from abusing its discretion, the district court's decision reflects careful adherence to the law.

It was not error, as the government claims, for the district court to weigh Stephen Quindoza's testimony and conclude he was "utterly impeached." JA6045. Despite Quindoza's coding qualifications, he "was wholly unaware of coding-related guidance that was highly relevant to this trial." JA6045-6046. More than once, Quindoza retracted incorrect testimony. JA6046. As for Quindoza's testimony on CPT code 99211, the

---

[24] The government suggests, bizarrely, that the district court's description of the verdict as "unjust," rather than a "miscarriage of justice," requires reversal. Br. at 42. The suggestion that an unjust verdict may not be a miscarriage of justice is lacks merit. *Rafiekian*, 68 F.4th at 193 ("Having concluded that it would be *unjust* to enter judgment of conviction for the reasons outlined above, the district court did not abuse its broad discretion in granting a new trial.") (cleaned up) (emphasis added).

district court found it "at best, confusing ... at worst, misleading." The government disregarded the guidance stating that the code "applies to COVID-19 testing *incident to* a physician's services," JA6021 (emphasis in original)—conducted by clinical staff, not providers.  The Court further cited Quindoza's admission on cross examination "that he was unaware of much of the COVID-specific guidance prior to testifying, which included guidance relating to the 99211 code." *Id.* The district court's determination, based on Quindoza's countless misstatements and lack of knowledge of key regulatory changes, that Quindoza lacked credibility was plainly within its broad discretion. *Rafiekian*, 68 F.4th at 186-87.

So, too, was the district court permitted to find defense expert Michael Miscoe credible. Unlike Quindoza, Miscoe had command of pandemic-era coding guidance that bore directly on the government's theory of the case. "More importantly, Miscoe was the only witness to explain what the relevant terms meant, and how they applied in the context of this particular case." JA6046. Contrary to the government's claims, Miscoe's reliance on medical records that, in some cases, contained mistakes, did not diminish the value of his testimony. As the district court explained:

> Errors or inaccuracies in the medical records notwithstanding, there is no real dispute that the patients presented to get COVID-19 tests, they received two tests, and the result of one test was

reviewed on the date of the encounter. Miscoe concluded that each of the charged encounters should be billed at a level 4 because presenting for a COVID-19 test is considered an "undiagnosed new problem with uncertain prognosis" and because each patient received two tests and the results of at least one test was reviewed on the day of the encounter. The evidence at trial established that the patients each met these criteria, despite any inaccuracies in the records.

JA6028.

In light of Miscoe's "precise and credible expert testimony," the district court rightly assigned the testimony of Deborah Needle and Cathy Raymond "little weight." JA6047. As explained above and as the district court observed, Needle had limited knowledge of CPT codes, and her discomfort with DEC's billing practices were not based on the CPT Manual. JA6047. Her belief that COVID-19-related visits should be coded at level 3 was based on a "feeling." JA6047 (citing JA1109). And Raymond's testimony at trial was focused solely on the "three key factors" model (history, exam, and medical decision making), a rubric for code selection that no longer applied in 2021, or in 2020 for telehealth. JA5011. Especially because Raymond's disagreement with DEC's coding practices in 2020 related to providers' documentation of the history and exam, JA0950-0951, JA0992, Raymond's lack of knowledge about DEC coding in 2021 undermines her testimony entirely and is hardly a "distinction without a difference." Br. at 45.

The district court also was not required, as the government suggests, to treat one email from Dr. Elfenbein as "sufficient alone" to find him guilty of five counts of health care fraud. Br. at 46. The district court carefully considered that email, in which Dr. Elfenbein told one DEC provider that "speed here is key" and the visits were "simple and straightforward." JA4483. As the district court explained, however:

> [T]he terms "straightforward" and "complex" for purposes of determining the appropriate code for a patient encounter have specific definitions ... They do not retain their conventional, plain-English meaning in this context. *While these emails may be highly relevant to the Defendant's intent, they are not proof of the falsity of the level 4 billing*.

JA6030 (emphasis added). Even viewed in the light most favorable to the government, Dr. Elfenbein's emails do not establish his guilt, and the district court was correct to reject the government's invitation to collapse the elements of falsity and scienter. JA6009. Under Rule 33, the district court was "unconstrained by any requirement to construe the evidence in the government's favor." *Rafiekian*, 68 F.4th at 186. The district court, "sitting as a thirteenth juror," was well within its discretion to disagree with the government about the importance of this email. *See id.*

Finally, the government's assertion that the district court "ignore[d]" how the number of patients presenting to DEC during the COVID-19

pandemic "undercut any notion that moderately complex medical decisionmaking was taking place," Br. at 47, rests on the discredited premise that the length of a provider visit dictates code selection. Throughout the case, the government has taken this position despite having *no evidence to support it*. The government's own expert admitted that, when coding based on MDM, time is not a factor. JA0504, JA4982, JA4986, JA5011, JA5203. It is true that three patients testified that their provider visits were brief. It is also true that, on very busy days, providers sometimes saw high volumes of patients. This evidence, however, simply has no bearing on the correct level, and it certainly does not establish that level 4 was the wrong code.

The visits at issue may have been shorter than the government would have liked, but prosecutors cannot impose minimum times for medical visits when none exist. This is especially true when judging, in hindsight, patient encounters that occurred during a global pandemic. Dr. Hugh Hill, the only medical expert to testify at trial, explained that while he "wouldn't want to," he has treated patients in 20 seconds. JA1705-1706.[25] Suzana Silva, who

---

[25] The government makes much of Dr. Hill's surprise at the volume of patients seen at DEC. Br. at 47. But it is undisputed that these patient encounters *did* occur. JA5917. Dr. Hill did not testify as an expert in CPT coding, and he expressed no opinion concerning the code applicable to any visit. His testimony that seeing 150 patients in a day "seems like [] an excessive burden," JA1697, said nothing about the applicable CPT code and certainly did not establish that the visits were not level 4.

treated patients during the Omicron COVID surge, testified that "whoever needed extra time got extra time." JA1962. Deborah Needle explained that treating patients for COVID-related concerns was "chaos," but that "we were trying to see patients and save lives." JA1036-1037, JA1040. She examined each patient, reviewed with them their histories and chief complaints, and made "professional medical judgments about what [she was] observing and what kind of treatment is necessary[,]" including, among other things, "whether the patient, for example, might need to go to the hospital or seek some other medical care," and "whether they need medication." JA1092-1094.

The district court did not abuse its discretion in refusing to cast aside evidence of controlling regulations and guidance in favor of the government's "commonsense" case against Dr. Elfenbein. The district court did "precisely" what was required: it "evaluate[d] the persuasiveness of the inculpatory evidence '*in comparison with other evidence*[.]'" *Rafiekian*, 68 F.4th at 189 (quoting *Weight of the Evidence,* BLACK'S LAW DICTIONARY (11th ed. 2019)). The district court properly exercised its discretion in concluding that "the evidence "weigh[ed] so heavily against the verdict that it would be unjust to enter judgment," JA6048, and this Court should not find otherwise.

## CONCLUSION

For the reasons explained above, the Court should affirm the district court's grant of judgment of acquittal on all counts. At a minimum, the Court should affirm the district court's grant of a new trial.

Respectfully submitted,

*/s/ Gregg L. Bernstein*
Gregg L. Bernstein
Martin S. Himeles, Jr.
Samantha A. M. Kavanagh
Zuckerman Spaeder LLP
100 East Pratt Street - Suite 2440
Baltimore, MD 21202-1031
Tel. No: (410) 332-0444
Fax No: (410) 659-0436
gbernstein@zuckerman.com
mhimeles@zuckerman.com
skavanagh@zuckerman.com

*Counsel for Defendant Ron Elfenbein*

**STATEMENT WITH RESPECT TO ORAL ARGUMENT**

Dr. Elfenbein respectfully joins in the government's request for oral argument.

## CERTIFICATE OF COMPLIANCE

In conformance with Local Rule 28.1(e)(2(B) and Rule 32(f) of the Federal Rules of Appellate Procedure, this brief contains 12,804 words.

This brief complies with the typeface and type style requirements because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Georgia font.

## CERTIFICATE OF SERVICE

I hereby certify that on October 1, 2024, the foregoing document was served on all parties or their counsel of record through the CM/ECF system.

October 1, 2024

*/s/ Gregg L. Bernstein*
ZUCKERMAN SPAEDER LLP
100 East Pratt Street, Suite 2440
Baltimore, MD 21202-1031
410.332.0444
gbernstein@zuckerman.com