No. 24-4048

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

### UNITED STATES OF AMERICA,

Appellant,

v.

### RON K. ELFENBEIN,

Appellee.

*Appeal from the United States District Court for the*
*District of Maryland, Northern Division*
*The Honorable James K. Bredar, Senior U.S. District Judge*

## REPLY BRIEF OF APPELLANT
## UNITED STATES OF AMERICA

**Glenn S. Leon**
**Chief, Fraud Section**

**Jeremy R. Sanders**
**Appellate Counsel**

**U.S. Department of Justice**
**1400 New York Avenue, NW**
**Washington, D.C. 20005**
**(202) 616-2650**

**Erek L. Barron**
**United States Attorney**

**Jason D. Medinger**
**Assistant United States Attorney**

**U.S. Attorney's Office**
**6406 Ivy Lane, Suite 800**
**Greenbelt, Maryland 20770**
**(301) 344-4433**

**November 1, 2024**          *Attorneys for the Appellant*

# TABLE OF CONTENTS

INTRODUCTION ................................................................. 1

ARGUMENT .................................................................... 5

I. THE DISTRICT COURT IMPROPERLY GRANTED THE DEFENDANT'S POST-TRIAL RULE 29 MOTION ................................................ 5

II. THE DISTRICT COURT IMPROPERLY GRANTED IN THE ALTERNATIVE THE DEFENDANT'S RULE 33 MOTION FOR NEW TRIAL……………...…..25

CONCLUSION .................................................................28

STATEMENT WITH RESPECT TO ORAL ARGUMENT .................................30

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## CASES

*United States v. Betro*, 115 F.4th 429 (6th Cir. 2024) ..............................................18

*United States ex rel. Druding v. Druding*, 952 F.3d 89 (3rd Cir. 2020) ................14

*United States v. Harra*, 985 F.3d 196 (3rd Cir. 2012) ............................................14

*United States v. Hunt*, 99 F.4th 161 (4th Cir. 2024) ..................................................5

*United States v. Janati*, 237 Fed. Appx. 843 (4th Cir. 2007) ............................ 2, 13

*United States v. Millender*, 970 F.3d 523 (4th Cir. 2020) .......................................25

*United States v. Paulus*, 894 F.3d 267 (6th Cir. 2018) ..................................... 14, 16

*United States v. Sanjar*, 876 F.3d 725 (5th Cir. 2017) ............................................18

## FEDERAL STATUTES AND RULES

U.S. Const., amend. VI ................................................................................................5

18 U.S.C. § 1347 ................................................................................................... 2, 13

Fed. R. Crim. P. 29.................................................................................................1, 5

Fed. R. Crim. P. 33.................................................................................................25

## INTRODUCTION

After considering reams of exhibits and hearing from numerous witnesses, a jury convicted Appellee Ron Elfenbein of health care fraud. Rightly so. Elfenbein devised and orchestrated a scheme in which he directed his staff to bill seconds-long, routine, drive-through COVID-19 test encounters using a Level 4 reimbursement code. He was told it was wrong by his medical coder, his nurse practitioner, and an insurance company auditor. He did it anyway, to turnaround his floundering business and maximize profits. And he papered it over with false entries in the medical records. As the jury correctly found, that was fraud. This was the jury's call to make, and the verdict was supported by ample evidence. As such, the district court was wrong to usurp the jury's function and grant Elfenbein's Rule 29 motion. The district court was equally wrong to conditionally grant Elfenbein's Rule 33 motion. This Court should reverse.

And nothing in Elfenbein's response brief demonstrates otherwise. In fact, he largely ignores the most damning evidence (his own emails and testimony). Instead, he relies on a hyper-technical defense that rises and falls with a crabbed reading of the CPT Manual that he concocted only after he put his fraud scheme in place. There are several problems with his approach.

First, Elfenbein misunderstands and misapplies the applicable standard, just as the district court did. Specifically, Elfenbein fails to grapple with the fact that the jury rejected his theory and instead sided with the government. As such, it is not enough for Elfenbein to simply rehash his closing argument, as he does here on appeal. The issue before this Court is much different. This Court must construe all evidence in the light most favorable to the government. And it must presume the jury resolved all ambiguities in the evidence in the government's favor. Then, this Court must determine whether any rational jury could have returned a guilty verdict. Given the mountain of evidence that was presented, and given all the inferences and presumptions that must be applied here, it is clear that the jury's verdict must be reinstated.

Second, Elfenbein is wrong to focus exclusively on his post-hoc reading of the CPT Manual. He was charged with violating the health care fraud statute, 18 U.S.C. § 1347, not the CPT manual. This Court has already rejected the very tactic Elfenbein is trying to deploy here. *United States v. Janati*, 237 F. App'x 843, 846 (4th Cir. 2007). The jury was perfectly within its rights to assess the constellation of evidence here and conclude Elfenbein executed a scheme to defraud. Indeed, the jury could have found health care fraud here based solely on the false entries in the

medical records. Or it could have credited Elfenbein's own words that the clinic staff was not to engage in complex decisionmaking. Or it could have reasonably credited the testimony of the auditor and coders who shunned Elfenbein's practices. In short, as the jury heard, this case was about much more than just the CPT Manual. Elfenbein's attempt to limit this Court's focus (and the reach of the health care fraud statute itself) to a single chart in the CPT Manual must therefore be rejected.

Third, even taking Elfenbein's claims at face value, they still fail. For starters, it must be remembered that Elfenbein's theory is one of post-hoc creation. He admitted he did not even look at the CPT Manual when he first pushed for Level 4's to be used across-the-board. JA 2260. But even taking his theory head-on, it collapses under the weakest of stress tests. The parties agree that a Level 4 code was reserved for either a 30- to 45-minute encounter or an encounter requiring moderately complex medical decision-making. On appeal, Elfenbein wisely concedes he could not make a time-based justification for a Level 4 code; the visits lasted only seconds as patients sat in their cars. So the only way his Level 4 submissions could not be false is if moderately complex medical decision-making was actually exercised during these visits. As the evidence overwhelmingly showed, it was not. Elfenbein himself admitted that complex decision-making was

not being done.  JA 4487.  In fact, he admonished his staff that if anything even approaching medical decision-making had to take place, the patients were to be referred elsewhere.  *Id.*  The CPT Manual analysis can stop right there.  Without a demonstration of moderately complex medical decision-making, Elfenbein's Level 4's are false.  But even going farther into the weeds, Elfenbein's claims still fail.  A rudimentary read of the very chart he cites in his response brief, along with the testimony of the witnesses, demonstrates he cannot justify Level 4's for these rote, drive-by testing encounters.

    In sum, Elfenbein took routine, seconds-long, drive-through COVID test encounters and billed them as if they were moderately complex medical visits, akin to a visit where a doctor is trying to diagnose a new lump that has formed in a patient's breast.  The jury saw this for what it was:  fraud.  And Elfenbein's theory here on appeal must be rejected.  If he were believed, a doctor could (post-hoc) claim moderately complex medical decision-making allegedly took place for a rote, second-long test encounter and escape with impunity (and millions).  The health care fraud statute is not so toothless.  Nor should juries be rendered so powerless. This Court should reverse.

**ARGUMENT**

## I. THE DISTRICT COURT IMPROPERLY GRANTED THE DEFENDANT'S POST-TRIAL RULE 29 MOTION.

Juries have primacy in our criminal justice system. U.S. CONST., amend. VI. To preserve this dynamic, when construing a Rule 29 motion, every presumption in favor of a jury verdict must be indulged. *United States v. Hunt*, 99 F.4th 161, 184 (4th Cir. 2024). If there is any discrepant testimony, this Court must presume the jury construed the evidence in favor of the government. *Id.* Jury verdicts must be sustained if "'*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* (citation omitted) (emphasis in original).

Against these standards, the district court erred in granting Elfenbein's Rule 29 motion because the jury heard more than enough evidence that Elfenbein devised and executed a scheme to submit false claims for reimbursement. The jury first heard evidence that all claims submitted must be supported by true entries in the medical records for work that was actually performed. JA 365-366 (government's expert); JA 1893 (defense expert stating that the work claimed must have been "actually performed" and "the medical records [must] be accurate"). The jury then heard the requirements for billing Level 4 evaluation and management ("E/M") reimbursement codes. JA 397-98 (government's expert stating Level 4 claims must

5

meet the 30- to 45-minute time requirements or the "moderate" complex decisionmaking requirements); JA 1735-1736, 1769 (defense expert stating the same).

And the jury heard evidence that Elfenbein willfully violated these standards and therefore submitted false claims.

The jury heard ample evidence that the medical records contained false entries that did not match the testimony from the patients and the providers about the encounters. *See* JA 669-670 (patient A.H. testifying that there were false entries in her medical records which did not accurately document her drive-through encounter); JA 1347 (testimony from provider about patient W.R.'s medical records where provider admitted that exams were not done as presented in the records); JA 848-849 (patient D.M. denying that any follow-up phone call took place as represented in her medical records); JA 1157-1160 (patient J.J. recounting her temperature being taken but not the full panoply of vitals being taken as represented in her medical records); JA 1006-1007 (patient S.T. denying any lengthy follow-up conversation took place as averred in the medical records); JA 1343-1346 (testimony about how the templated medical records that Elfenbein set up would state a patient was exposed to COVID when they were actually only being tested in order to travel).

Indeed, the jury had Elfenbein's own email in which he admitted, "we ARE NOT DOING AN EXAM," JA 4436, and yet the medical records are rife with false claims that thorough exams were done.

The jury also had extensive evidence that the Clinic was _not_ engaged in moderately complex medical decision-making, but instead was only doing rote, rapid, seconds-long, drive-through encounters. The jury had photos of the operation, which demonstrated the entire process was like a fast-food drive-through and not a place where any modicum of complex decision-making could take place. JA 4682-4683. They had testimony that the encounters were brief, and lacking in any complexity. JA 669-670 (testimony of A.H. that the entire encounter only took a "few minutes"); JA 4487 (Elfenbein noting he wanted the encounters to last less than five minutes); JA 4497 (email from Clinic employee likening the process to "moving a herd of cattle through a pass at 60 heads per minute"). Finally, the jury had Elfenbein's own email in which he told his staff, "[w]e are not there to solve complex medical issues, etc. . . . . Just to test them." JA 4487.

The jury also heard that Elfenbein was told repeatedly that using a Level 4 E/M code was not appropriate for this kind of service, but he demanded that it be done anyway. His medical coder originally suggested a Level 1 (JA 4436), and

later testified that these kinds of services merited a Level 3 at best if there was sufficient documentation, which, as detailed above, there was not (JA 998; JA 909-913). His nurse practitioner told him that Level 4 was "higher than it should be." JA 1042. An auditor testified about insurance company audits which found that Elfenbein was improperly billing Level 4 E/M codes for these drive-through test encounters. JA 1173-1194. Nevertheless, despite all these warnings, Elfenbein plowed ahead and demanded categorically that all these drive-through encounters must be billed at a Level 4. JA 4464 (Elfenbein stating, "[a] Covid patient is always a level 4 unless they are symptomatic in which case level 5 is justified").

The jury also heard evidence of guilty knowledge. Elfenbein demoted his medical coder and forced her to work the front desk after she raised concerns about his coding mandates. JA 984-986. Similarly, a nurse practitioner tried to raise her concerns about his Level 4 dictates, but Elfenbein just avoided her when she tried to talk to him. JA 1048-1049. Likewise, the Clinic tried to dodge the insurance auditors by failing to provide medical records even after four requests, and even then they only provided incomplete records. JA 1173-1175. And even after receiving a negative audit report, Elfenbein continued to bill these visits at Level 4. JA 1176-

78. In short, the jury heard that Elfenbein was on notice of the falsity of his claims, but he kept doing it anyway.

The jury also heard ample evidence of motive. Specifically, the jury heard that Elfenbein's business was struggling financially—it lost money in 2017 and 2018 and only broke even in 2019. JA 2287. By contrast, with this scheme in place, Elfenbein's income soared almost five-fold. JA 2578.

This was more than enough evidence for a rational jury to conclude that Elfenbein committed health care fraud. The district court was wrong to countermand the jury and usurp its role. This Court should therefore reverse.

And nothing in Elfenbein's response demonstrates otherwise.

First, Elfenbein on appeal makes the same mistake that the district court did: he wholly misapplies the proper standard of review. The major premise of Elfenbein's response is that the government somehow failed to prove the falsity of his claims. Response Br. at 22-44. He is clearly wrong; there was more than ample evidence to support falsity. But his arguments are doubly wrong on appeal because they ignore the applicable standard. The jury found in favor of the government. Thus, all evidence and inferences therefrom must be construed in the light most

favorable to the government. Based on the extensive trial record, and with the proper presumptions in place, Elfenbein's argument founders.

Take, for example, the false entries in the medical records. The jury could have convicted Elfenbein for health care fraud on this basis alone. Both the government and the defense experts testified that (self-evidently) medical records must not be false. JA 365-366 (government's expert); JA 1893 (defense expert). Additionally, the jury saw evidence that Elfenbein certified time and again that he would not submit claims for reimbursement based on false medical records. JA 2644-2646; JA 2695-2696. And yet, as detailed above, multiple witnesses testified about false entries in the medical records. If the jury credited this testimony (and under *Hunt* we must presume that it did), then the government more than surpassed its burden to demonstrate that Elfenbein knowingly submitted false claims in violation of the health care fraud statute.

Similarly, the jury could have convicted Elfenbein because it believed (rightly) that no moderately complex medical decision-making was taking place during the drive-through encounters, and hence Elfenbein's Level 4 claims were necessarily false. To get to this decision, the members of the jury could have simply credited their own eyes by seeing the photos of the Clinic operations (JA 4682-4683)

which undermined any claim that moderately complex decision-making was taking place.   The jury likewise could have credited their own ears which heard testimony that the encounters were brief, rote, and lacking in any complexity whatsoever.   JA 669-670.   The jury could have credited Elfenbein's own email which stated directly that the providers were not there to solve any complex medical problems.   JA 4487.  The jury could have also credited Elfenbein's own expert, Hugh Hill, who testified that it was impossible for a provider to see 150 patients in one day, even though that was what Elfenbein's providers were claiming.   *See* JA 1697 (Hill testifying that he did not believe one provider could see 150 patients in one day); JA 1503 (Agent McCann testifying about email from Elfenbein to his providers stating that two providers saw 350 patients in one day).   The jury could have rightly concluded that no amount of moderately complex medical decision-making could have been taking place with that volume of patients being seen, if indeed they were all seen by providers at all.   Given that we must presume the jury credited all of these pieces of evidence, this was more than enough for a rational jury to conclude that Elfenbein's Level 4 claims were false.

And while Elfenbein strains in his response brief to try to downplay the government's evidence and highlight his own theory, he fails to apprehend that the

time for such arguments has passed. Once the jury rendered its verdict, everything changed. All presumptions must now be tilted in favor of the jury verdict. So, for example, while Elfenbein tries to suggest that the patients' memories were not crystal clear and he asks this Court to rely instead on the medical records alone, Response Br. at 16-19, 46-47, this is a misapplication of the appropriate standard. This Court must presume the jury credited the testimony of patient A.H., for example, that the reality of her encounter did not match the false entries in her medical records. In that way, the Level 4 claim for her visit is necessarily false because it is premised on a false medical record. Likewise, while Elfenbein makes a number of arguments in support of his view of the CPT Manual, Response Br. at 23-43, this Court must presume the jury resolved itself in favor of the government's interpretation and credited Elfenbein's own statement that the visits did not feature complex medical decision-making. As such, his Level 4 claims for the charged counts were necessarily false. Because he makes the same mistake the district court made, Elfenbein's arguments on appeal should be rejected and the district court's decision should be reversed.

Second, Elfenbein similarly errs by his myopic focus on the CPT Manual. *See* Response Br. at 23-47. Pointedly, he was not charged with violating the CPT

Manual. He was charged with committing health care fraud, in violation of 18 U.S.C. § 1347. JA 14-28. This case encompassed so much more than a cursory cross-check of CPT Manual rules. This case involved: false entries in medical records (JA 669-670); assembly-line medical testing being billed as if it were a moderately complex encounter (JA 4682-4683); workplace retaliation against dissenting employees (JA 984-986); aggregated billing data showing Elfenbein's practices were several standard deviations above national averages (JA 4541); and emails from Elfenbein pushing profits above all else (JA 4459) in order to salvage his floundering business (JA 2287). This Court has previously rejected the defense tactic to transmogrify a health care fraud case into a routine CPT Manual audit. *Janati*, 237 F. App'x at 843. It should do so again here.

Third, even taking Elfenbein's claims about the CPT Manual at face value, they still fail under even the smallest amount of scrutiny. For example, while Elfenbein avers that the CPT Manual was ambiguous and there was no testimony to clarify whether the claims were false or not, Response Br. at 23, that is demonstrably false. For starters, the CPT Manual was not ambiguous; it is written in plain English and it is well within the jury's prerogative to apply their common sense to determine the truth or falsity of claims under the CPT Manual. This is because juries (not the

district court) must resolve contested issues of fact at trial. *United States ex rel. Druding v. Druding*, 952 F.3d 89, 98-101 (3rd Cir. 2020) (reversing grant of summary judgment on False Claim Act fraud suit and holding that jury should decide whether doctor's claim submission was false under the applicable regulations); *United States v. Paulus*, 894 F.3d 267, 275-80 (6th Cir. 2018) (reversing grant of Rule 29 motion for doctor convicted of health care fraud because "it is up to the jury—not the court—to decide whether the government's proof [of falsity] is worthy of belief"); *United States v. Harra*, 985 F.3d 196, 216 (3rd Cir. 2012) (juries are charged with determining falsity of a defendant's statements in light of applicable regulations).[1]

Moreover, the facts presented to the jury dispelled any potential ambiguity as applied in this case. For example, both parties' experts agreed that a Level 4 required at least moderately complex medical decision-making, JA 397-98; JA 1735-1736, and here Elfenbein admitted they were *not* providing complex medical care, JA 4487. There is no ambiguity there. The jury was therefore perfectly entitled to find the Level 4 claims were false on this basis alone.

---

[1] In this way, Elfenbein is flat wrong to aver that this kind of "conduct is criminal because federal prosecutors say so." Response Br. at 2. A jury of his peers said so.

But even if looking further into the testimony regarding the falsity of the claims under the CPT Manual, the jury had plenty here. For example, the government's expert witness (Quindoza) testified that a Level 4 CPT code was certainly not appropriate for a short, non-complex encounter, JA 661-664, which is what the encounters in this case were. Quindoza also testified that encounters for specimen collection and assessment of COVID tests—which is all that Elfenbein's clinic was actually doing—were to be billed under the 99211 CPT code. JA 401. His testimony on this point was corroborated by guidance from the American Medical Association ("AMA"), JA 4684, and from the State of Maryland Health Department, JA 1909-1910; JA 4685, which both indicated that this type of service was properly billed as 99211. Likewise, as detailed above, Elfenbein's medical coder (Raymond) suggested initially these visits should be coded as Level 1's (JA 4436); and she said they were certainly not Level 4's based on the documentation she saw (JA 998). Finally, the insurance auditor (Sinagra) testified to the audit findings by CareFirst, to which many of the false and fraudulent claims were submitted, explaining that many of these visits should be Level 1's or Level 2's, *e.g.*, JA 1183, 1198, and there was no difference between the audited claims and the claims that formed the charged counts in this case. In this way, the government

sponsored plenty of evidence about how these visits should have been coded. Under *Hunt*, we must presume the jury credited this testimony about the CPT Manual, applied it to the other testimony about the charged counts, and properly concluded the claims were false.

This exercise brings into focus one of the primary failings of the district court: it clearly took it upon itself to credit the defense expert and defense witnesses over the government's proof. The district court failed to consider the constellation of evidence and apply the proper presumptions in favor of the jury verdict. This is reversible error. *See Paulus*, 894 F.3d at 277 ("the court may not enter a judgment of acquittal merely because it doubts the persuasiveness of the government's expert testimony"). In sum, Elfenbein is wrong to suggest that the jury was left in ambiguity about the proper CPT Manual coding for these drive-by visits; they had more than enough to convict. And because the jury properly resolved any ambiguities in favor of the government, the district court must be reversed.

It should also be noted that Elfenbein's argument on this point ignores the admissions of his own expert. For example, his own expert admitted that if a patient did not see a provider during a COVID specimen collection encounter like the ones at issue here, a Level 1 (99211) would be the proper code. JA 1906. Accordingly,

assuming, as we must, that the jury credited A.H.'s testimony, for example, that she never saw a provider and rather simply had her nose swabbed and then she drove away, JA 672, Elfenbein's own expert testimony supports the coding of a Level 1 for A.H.'s visit, which means the Level 4 was necessarily false. Likewise, Elfenbein's expert admitted that a Level 4 claim would be false if the encounter involved "straightforward or low-level medical decision making in ten minutes or less." JA 1899. Given that the jury is presumed to have concluded that none of these drive-by, seconds-long testing encounters involved moderately complex medical decision-making, the jury could have used the defendant's own expert's admissions to conclude that, under the CPT Manual, Elfenbein's Level 4 claims were false. In this way, there was more than sufficient testimony about the requirements of the CPT Manual and the circumstances of the charged counts in this case for the jury to find they were false.

Additionally, Elfenbein is wrong to claim that no expert testimony provided that Level 4 billing was inappropriate as to the charged counts. Response Br. at 26. For starters, expert testimony was not required at all. The jury had Elfenbein's own email that they were not there to solve complex problems, and yet, despite all the warnings from auditors and coders, he nevertheless billed the drive-by encounters

as if moderately complex medical decision-making was taking place. That was more than enough; no expert testimony was required to show that such claims were false. *See United States v. Betro*, 115 F.4th 429, 445 n.2 (6th Cir. 2024) (no expert testimony required to demonstrate services were medically unnecessary when doctors had prior notice their claim submissions were inappropriate and yet they persisted). Indeed, as the Fifth Circuit noted, there is no topic in criminal law where expert testimony is required to prove an essential element; to require expert testimony would be "at odds with the jury's considerable discretion to weigh evidence, both direct and circumstantial, that may prove or disprove an element of the offense." *United States v. Sanjar*, 876 F.3d 725, 745 (5th Cir. 2017). In this way, to the extent Elfenbein is arguing that the government was required to put on expert testimony about each specific charged count to avoid a Rule 29 motion, he is clearly mistaken.

Elfenbein is also wrong because he fails to look at the record holistically and acknowledge that there *was* expert testimony that, combined with other evidence, demonstrated the falsity of the claims. For example, as detailed above, there was expert testimony that medical records supporting reimbursement requests could not be false, and yet the testimony from the patients demonstrated the claims were based

on medical records with false entries. Combined together, this demonstrates that Elfenbein submitted false claims. Similarly, there was expert testimony that Level 4 claims would be false if there was no moderately complex medical decision-making, and yet the evidence showed these drive-by encounters were the antithesis of complex. Combined together, this demonstrates that Elfenbein submitted false claims. In this way, the jury was well with its rights to take the rubrics provided by the experts, apply them to the facts, and determine (correctly) that Elfenbein's claims were false.

Additionally, while Elfenbein argues that the "government did not charge . . . a scheme to defraud based on 'fake' medical records," Response Br. at 44-46, that, also, is demonstrably false. Both the averments in the indictment as well as the evidence and arguments submitted at trial demonstrated this theory of falsity. For example, the indictment averred that physicians like Elfenbein had to comply with all policies, rules, and regulations of the applicable health care benefit program. JA 16 (Medicare/Medicaid); JA 19 (commercial insurance programs). And one of these policies was that notations in medical records had to be true. Indeed, the indictment specifically alleged that providers like Elfenbein were required to maintain "complete and accurate patient medical records." JA 17; *see also* JA 19.

The indictment also alleged that claims had to be properly documented and demonstrate care that was "actually provided as represented." JA 18-19. In terms of Elfenbein's specific scheme to defraud, the indictment indicated that he submitted claims for services that were "not provided as represented, and ineligible for reimbursement" and that his scheme involved "concealing" the "false and fraudulent" nature of the submitted claims. JA 22-23. Further, in terms of the manner and means in which Elfenbein perpetrated the scheme, the indictment alleged that the Level 4-billed encounters "did not occur as represented." JA 24; *see also* JA 25 (indicating that the false claims were for services that were "not provided as represented").

A similar theme was argued to the jury throughout a trial. For example, during opening statements, the government stated that the "office visits were a lie. They never happened" as represented. JA 322. The government also forecast that the evidence would show that "[p]roviders can't lie to Medicare" and yet that is what Elfenbein did when he submitted claims that did not comport with accurate medical recordkeeping requirements. JA 324. Further, during closing, the government noted that "we know the work wasn't actually done" as reflected in the medical records. JA 2350. The government also highlighted during closing particular

patients who testified that their medical records contained false entries.  JA 2351-2356.  The same theme was made in the rebuttal closing argument.  JA 2416-2417.  In short, Elfenbein is simply wrong when he claims this case was not about false medical records.  This case was about false claims, and part of the falsity of the claims was that the claims were supported by false medical records.  And that theory of falsity was presented in the initial indictment, it was developed through the witness testimony and exhibits at trial, and it was highlighted during closing argument.

Finally, even taking Elfenbein's CPT Manual defense at face value, it still fails.  We must first remember that this entire defense was one of post-hoc creation.  Elfenbein admitted he did not even consult the CPT Manual before mandating these visits would be Level 4's.  JA 2260.  In fact, Elfenbein admitted in an email that CPT Manual coding was "out of [his] wheelhouse."  *Id.*  So, it is reasonable to conclude the jury discounted and rejected his theory on those bases alone.

But even if we delve into the chart on which Elfenbein's entire defense lies, *see* Response Br. at 9, it easily collapses at the very first step in the analysis because the Clinic was not treating an undiagnosed new problem with an uncertain prognosis; he was simply doing routine drive-through COVID testing for the masses.  In order

to merit the designation of "moderately complex" medical decision-making and justify a Level 4 claim, Elfenbein had to demonstrate that a potential COVID exposure testing encounter counted as treating an "undiagnosed new problem with uncertain prognosis." JA 4663.[2] The CPT Manual provided that this code was only appropriate where "[a] problem in the differential diagnosis [] represents a condition likely to result in a high risk of morbidity without treatment. An example may be a lump in the breast." *Id.* By contrast, the CPT Manual provided that minimal medical decision-making would be necessary for treatment of a "self-limited or minor problem." JA 4666.

Here, there was a mountain of evidence which undermined any claim that Elfenbein's drive-by testing encounters were at all treating an "undiagnosed new problem with an uncertain prognosis." First, Elfenbein's own expert testified that "with COVID, we have a presumed condition: contact with or exposure." JA 1863; *see also* JA 1765-66. Elfenbein's emails confirmed he operated under the same paradigm; he established templates to ensure his providers presumed a COVID

_____

[2] Elfenbein eschewed at trial reliance on any other possible bases in column one of the CPT Manual medical decision-making chart. JA 2238. He also eschewed any reliance on time as a potential factor to justify his claims. JA 2233. So, his claims were necessarily false unless he established that he was evaluating and managing an "undiagnosed new problem of uncertain prognosis."

exposure and tested (and billed) accordingly.  JA 4451; JA 671-672; JA 1338-1339. In this way, the claims charged here were not treating an *undiagnosed* new problem; they were presuming the diagnosis from the start and testing without doing any medical decision-making at all.

Second, Elfenbein's own expert also admitted that for a "self-limited or minor problem" (which would only necessitate "minimal medical decision-making" and hence would only justify a Level 2 claim), the patient "can have symptoms, but it's something that's going to resolve with usually over-the-counter [medications] or instructions like rest, gargling, sore throat, something like that."  JA 1870; JA 1902. And here, the medical records showed that that is precisely what was prescribed to the Clinic's patients.  JA 3671, JA 3685, JA 3755 (advising patients to "[r]est and keep hydrated" and use "Tylenol as needed").  This further underscores that the Clinic was not managing an undiagnosed new problem; rather, they were treating a self-limited or minor problem, which only qualified for a Level 2 at most.

Third, the evidence showed that Elfenbein's demanded Level 4's for asymptomatic patients.  JA 4459, 4461.  Moreover, he provided that if a patient needed any modicum of actual medical care because they "look[ed] bad," they were to be referred to a hospital.  JA 4487.  In this way, Elfenbein was not claiming

Level 4's for patients with a "high risk of morbidity without treatment." These patients were asymptomatic and demonstrating zero risk of morbidity. If they had anything approaching a risk of morbidity, he instructed his providers to refer the patients elsewhere. And the CPT Manual teaches that referring is not treating, and hence a provider cannot claim moderately complex medical decision-making by referring a patient elsewhere. JA 4662. Moreover, Elfenbein admitted at trial that his patients were not presenting with a high risk of morbidity; rather, he said that for the "vast majority of our COVID patients . . . it was very low -- minimal or low risk." JA 2239. In this way, Elfenbein cannot possibly have maintained that he was submitting claims for evaluation and management of an "undiagnosed new problem with an uncertain prognosis." He was doing anything but. Accordingly, what Elfenbein was doing (rote, drive-by COVID testing) failed at every step of the definition in the CPT Manual for an undiagnosed new problem. And the seconds-long, drive-through testing Elfenbein was doing was certainly light years away from the example given in the CPT Manual, *i.e.* the management of a new lump in the breast. The jury was entitled to find that his claims failed at step one of the CPT Manual chart because the Clinic was not managing any undiagnosed new problem

of uncertain prognosis.  As such, his Level 4 claims were demonstrably false even on the narrow rubric he chose for his defense.

In sum, there was a wealth of evidence that supported the jury's verdict here. The district court was wrong to usurp the jury's role.  This Court should reverse the district court's grant of the Rule 29 motion.

## II.    THE DISTRICT COURT IMPROPERLY GRANTED IN THE ALTERNATIVE THE DEFENDANT'S RULE 33 MOTION.

This Court also should reverse the district court's conditional grant of Elfenbein's motion for a new trial.  This Court has made clear that "a court should exercise its discretion to grant a new trial sparingly." *United States v. Millender*, 970 F.3d 523, 531 (4th Cir. 2020) (internal quotations omitted).  A new trial is warranted only "when the evidence weighs so heavily against the verdict that it would be unjust to enter judgment." *Id.*  This is not such a case.  Indeed, as detailed above, this case featured a doctor who overrode his own medical coder, staff, and insurance auditors to mandate that seconds-long, routine testing encounters which took place in patients' cars be billed at Level 4's or 5's across-the-board as if they were complex medical visits.  And he papered everything over by mandating the use of templated medical records which resulted in the claims being supported by false medical records.  And he did this because he expressly wanted to make

more money per visit, which was important to salvage his failing business.   All this was on full display for the jury, and supported by emails, fake medical records, and testimony from patients, former staff, outside auditors, and experts.   The jury reached the just result here.   No new trial is warranted.

And again, Elfenbein offers nothing in his response.

First, he leans heavily on the testimony of his expert (Miscoe).   Response Br. at 55-56.   However, the defense expert admitted that his opinion as to the charged claims relied solely on the medical records, JA 1785, 1881, and so if the medical records were false (which they were), his opinions are worthless.   The defense expert simply provides no help to Elfenbein because his testimony relied on a counter-factual world that did not exist.

Second, Elfenbein tries to discount the testimony of Raymond as relegated only to the 2020 CPT Manual standards.   Response Br. at 56.   Not so.   Raymond's testimony was applicable to both the 2020 and the 2021 standards.   The only thing that changed between the two periods was that in 2021, a full history and physical did not need to be documented.   And in any event, Raymond's larger concern was that what they were doing (drive-by testing encounters) simply did not rise to a Level 4.   JA 4436.   That was true in 2020, and it was equally true in 2021.   And one

thing Raymond said that certainly held true throughout: just because it was a pandemic and some rules were being relaxed, "that's not carte blanche for over coding." JA 4438. Elfenbein disregarded this advice and instead chose to commit fraud.

Third, while Elfenbein's tries at the end of his brief to explain some of his own emails, Response Br. at 57-58, these efforts fall flat. Elfenbein admitted he was not engaged in solving "complex" medical problems, JA 4487, so he cannot make the post-hoc claim he was engaged in complex medical decision-making now. Likewise, Elfenbein admitted the visits were "simple and straightforward," JA 4483, which is the kind of visit that merits a Level 1 or 2, and so he cannot make the post-hoc claim now that these were all Level 4's. Further, Elfenbein admitted that they were not doing an exam, JA 4436, and so he cannot try to defend the fake medical records now which indicate (counter-factually) that comprehensive exams were done. The government acknowledges that, in the Rule 33 context, this Court need not construe all inferences in favor of the government. But with admissions like these in the emails, there is no need for presumptions. The fraud speaks for itself.

In sum, the standard for obtaining a new trial is high. The evidence here did not weigh heavily in favor of Elfenbein; it was just the opposite; the evidence

weighed overwhelmingly in favor of the verdict. As such, the district court was wrong to conditionally grant the Rule 33 motion.

* * *

After hearing almost two weeks' worth of testimony and viewing more than 200 exhibits, the jury had no trouble convicting Elfenbein of health care fraud. This was the jury's call to make, and their decision was based on ample evidence. Because juries have pride of place in deciding guilt and innocence, it was wrong for the district court to nullify the jury's verdict. The district court misapplied the appropriate standard, misinterpreted the evidence in the record, and mistook its role for the one constitutionally granted to the jury. This Court should reverse, and the jury's verdicts should be reinstated.

## CONCLUSION

Based on the foregoing, the government respectfully requests that this Court reverse the district court's grant of Elfenbein's motion for acquittal and new trial, and reinstate the jury's verdict.

Respectfully submitted,

Glenn S. Leon
Chief, Fraud Section

By: _____/s/_____

Jeremy R. Sanders
Appellate Counsel

U.S. Department of Justice
1400 New York Avenue, NW
Washington, D.C. 20005

Erek L. Barron
United States Attorney

By:                    /s/
Jason D. Medinger
Assistant United States Attorney

United States Attorney's Office
6406 Ivy Lane, Suite 800
Greenbelt, MD 20770

**STATEMENT WITH RESPECT TO ORAL ARGUMENT**

The United States respectfully requests oral argument in this case given the voluminous record and the legal issues presented.   And the government acknowledges that this Court has tentatively scheduled this matter for oral argument in January 2025.

# CERTIFICATE OF COMPLIANCE

1.    This brief has been prepared using:

   **Microsoft Word, Times New Roman, 14 Point**

2.    EXCLUSIVE of the corporate disclosure statement; table of contents; table

   of citations; statement with respect to oral argument; any addendum

   containing statutes, rules, or regulations, and the certificate of service, the

   brief contains 6,200 words.

   I understand that a material misrepresentation can result in the Court's

striking the brief and imposing sanctions. If the Court so directs, I will provide an

electronic version of the brief and/or a copy of the word or line print-out.

_____/s/_____<br>
Jason D. Medinger<br>
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 1st day of November 2024, I electronically

filed the foregoing with the Clerk of Court using the CM/ECF System, which will

send notice of such filing to the following registered CM/ECF users:

Gregg Lewis Bernstein, Esq.
Martin S. Himeles, Jr., Esq.
Samantha Miller, Esq.
Zuckerman Spaeder LLP
100 East Pratt Street, Suite 2440
Baltimore, Maryland 21202

_____/s/_____
Jason D. Medinger
Assistant United States Attorney